## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **SAVE OUR SCHOOLS—SOUTHEAST & NORTHEAST, et al.,** |
| **Plaintiffs,** |
| **v.** |
| **DISTRICT OF COLUMBIA BOARD OF EDUCATION, et al.,** |
| **Defendants.** |

**Civil Action 04-01500 (HHK)**

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Save Our Schools–Southeast and Northeast ("Save Our Schools"), a community-based nonprofit association, and seven of its individual members, bring this putative class action alleging that defendants violated, and continue to violate, plaintiffs' Fifth Amendment due process and equal protection rights, actionable under 42 U.S.C. § 1983,[1] and the District of Columbia Human Rights Act ("Human Rights Act"), D.C. Code § 2-1401 *et seq.* Defendants are: the D.C. Council and two of its members at the time the complaint was filed (Sharon Ambrose and Kevin Chavous); the D.C. Board of Education and eight of its members when the complaint was filed (Tommy Wells, Peggy Cooper-Cafritz, Robin Martin, Laura Gardner, Mirian Saez, Carrie Thornhill, Julie Mikuta, and Dwight Singleton); Mayor Anthony Williams; the D.C. Public

---

[1] Plaintiffs' amended complaint suggests that their constitutional claims are also actionable under 42 U.S.C. § 1981. Section 1981, however, is not a viable means of pursuing plaintiffs' claims. Section 1981 states that "all persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts, to sue, be parties, [and] give evidence . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. As § 1981's applicability is limited to disputes over those civil rights enumerated in the statute, none of which are implicated here, § 1981 is simply not relevant. Plaintiffs seem to concede as much and never mention § 1981 in their opposition to defendants' motions.

Schools ("DCPS") and the school system's former acting superintendent, Dr. Robert C. Rice; the

D.C. Public Charter School Board; Two Rivers Charter School ("Two Rivers"); and Margaret

Spellings, Secretary of the U.S. Department of Education.

Before the court are four motions to dismiss filed by different groups of defendants.[2]

Upon consideration of the motions, the opposition thereto, the record of this case, and the

argument of counsel at a hearing, the court concludes that many, but not all, of plaintiffs' claims

must be dismissed.

## I. BACKGROUND

Plaintiffs' prolix forty-nine page amended complaint is, in large part, a diatribe against the

public school system in the District of Columbia.[3]   Plaintiffs note that many of the District's

public schools perform far below national standards.   *See* Am. Compl. ¶ 81 (stating that 68 of the

District's 149 public schools fail national standardized testing).   According to plaintiffs, such low

performance is "primarily the result of mismanagement, entrenched bureaucracies, incompetent

leadership, and perhaps most significant, overlapping and unclear lines of authority between the

various public servants."   *Id.* ¶ 1.   As a result, there has been a "massive flight" from public

schools by families moving or otherwise seeking alternative educational options for their children.

---

[2]   Defendants have separated into four groups, each of which is represented by different counsel:  (1) the D.C. Council and its members (collectively, "Council defendants"); (2) the D.C. Board of Education and its members, DCPS and its former acting superintendent, the D.C. Public Charter School Board, and Mayor Anthony Williams (collectively, "District defendants"); (3) Two Rivers; and (4) Spellings.

[3]   Plaintiffs originally filed a complaint on September 1, 2004.  Plaintiffs have since filed an amended complaint on February 2, 2005, after the court granted, in part, defendants' motion for a more definite statement.  The amended complaint still is an unfocused polemic reflecting a "throw it against the wall" with the hope that something will "stick" approach.  Such advocacy is lamentable and serves only to delay the court's consideration of claims that might have merit.

*Id*.  Given this exodus, plaintiffs allege that DCPS's student body is now composed primarily of students from low-income Black families who cannot afford to pay for private education or otherwise seek education elsewhere.  The individual plaintiffs' children are some of these students.

Plaintiffs allege that the District's charter schools add to this problem by receiving better funding and superior administrative attention as compared to the District's non-chartered public schools, thereby "starving and condemning the public schools."  *Id*. ¶ 4.  Plaintiffs focus in large part on one such charter school, defendant Two Rivers.  Two Rivers, which was granted its charter in 2003 and began operating in Fall 2004, was assertedly founded by affluent white families who felt that the District's public school student body was "too black."  *Id*. ¶ 30.  Plaintiffs allege that all defendants (except Spellings) knew of and possibly shared this sentiment.  As a result, plaintiffs contend, the racial make-up of Two Rivers' student body is considerably different from that of DCPS as a whole.  Specifically, plaintiffs state that the student population in the District's non-chartered public schools is 84.4% Black.  In contrast, Two Rivers' initial student body was expected to have been 45% White, 40% Black, 10% Latino, and 5% Asian.  *Id*. ¶ 31.  Plaintiffs insist that the disparity in racial make-up between DCPS's students and the students that attend Two Rivers is the result of the charter school's discriminatory admissions policy and its reluctance to recruit Black students.

Further, plaintiffs assert that a conspiracy between Two Rivers' founders and the other District defendants has resulted in superior facilities for Two Rivers at the expense of the District's non-chartered public schools.  Plaintiffs contend that their children (or, in the case of Save Our Schools, its members' children) attend schools that are either mostly or entirely

3

composed of low-income Black students and that those schools' resources have been withheld or diverted because of defendants' discriminatory goals.  In pertinent part, plaintiffs state that their children's schools have been subjected to numerous budgetary and programming cuts as a result of funds that have been diverted to the District's charter schools, such as Two Rivers.

One specific example cited by plaintiffs is Eliot Junior High School ("Eliot"), where at least two of plaintiffs' children are students.  Eliot, which is 100% Black, has experienced budget cuts and elimination of, *inter alia*, "programs in music, art, and technical instruction."  *Id.* ¶ 22. In contrast, Two Rivers, which has been given space in the Eliot building at a discounted rate, offers all of these programs as well as language courses, full-time teacher assistants, and other amenities not available at Eliot.  Plaintiffs additionally claim that Two Rivers emphasizes the separation between Eliot's and its own students by maintaining a separate entrance for its students on the Eliot campus.  Plaintiffs insist that these disparities are the result of defendants' systematic discrimination against low-income Black students.[4]

In addition, plaintiffs have brought suit against defendant Spellings in her capacity as Secretary of Education.  Plaintiffs claim that Spellings's authorization of funding for the District's charter schools violates due process principles.  Plaintiffs assert that Spellings's implementation of the No Child Left Behind Act ("NCLB"), 20 U.S.C. § 6301 *et. seq.,* deprives District public schools of much-needed funding by requiring that those schools meet the Act's unfunded mandates.  In addition, plaintiffs claim that although NCLB requires that students in failing

---

[4] Plaintiffs describe budgetary and programming losses resulting from defendants' actions at four additional District public schools:  Stuart Hobson Middle School, Simon Elementary School, Sousa Middle School, and Wilson High School.

schools be given the opportunity to transfer to performing schools, their children are denied the right to do so because there is no space at better schools.

Plaintiffs' amended complaint includes class allegations and seeks relief under five different counts, each of which alleges violations of the Fifth Amendment of the U.S. Constitution, as well as the Human Rights Act:[5]

- **Count One**:  Count One challenges the allegedly discriminatory admissions process at Two Rivers and claims that all of the defendants but Spellings, with full knowledge of the "discriminatory impact of the Two Rivers' admissions process," Am. Compl. ¶ 64, conspired to obtain public resources for Two Rivers at the expense of D.C.'s non-chartered public schools.

- **Count Two**:  Asserted against all defendants except for the D.C. Charter School Board and Spellings, Count Two targets the entire charter school regime, alleging that it violates the Fifth Amendment and the Human Rights Act by favoring "charter schools at the expense of public schools."  *Id.* ¶ 71.

- **Count Three**:  Count Three alleges that defendants (other than Two Rivers and the D.C. Charter School Board) fail "to deliver quality education" to students at D.C.'s non-chartered public schools in violation of plaintiffs' asserted fundamental right to an education.  *Id.* ¶¶ 82, 84.

- **Count Four**:  In Count Four, plaintiffs claim that the students at D.C.'s non-chartered public schools are "mostly low income African Americans" and that at least some of the defendants "affirmatively act[] to keep it this way."  *Id.* ¶ 90.  The resulting segregation, according to plaintiffs, violates the Fifth Amendment and the holding of *Brown v. Board of Education*.

---

[5]  The relevant provision of the Human Rights Act, D.C. Code § 2-1402.41, prohibits any educational institution from discriminating based on, *inter alia*, race, religion, sex, age, familial status, or source of income.  By its terms, this section of the Human Rights Act applies only to educational institutions, which are defined as institutions "in which professors or teachers, using instructional material, follow a curriculum resulting in the increased skill or knowledge of their students."  *U.S. Jaycees v. Bloomfield*, 434 A.2d 1379, 1383 (D.C. 1981).
    The only defendant in this case that is an educational institution is Two Rivers, and the only counts asserted against Two Rivers are Counts One and Two.  Therefore, the Human Rights Act claims in Counts Three through Five are dismissed.  Defendants concede as much in their opposition by only arguing for the viability of the Human Rights Act claims as they pertain to Counts One and Two.

- **Count Five**: Count Five alleges that defendants (other than Spellings, Two Rivers, and the D.C. Charter School Board) fail "to provide an adequate process to allow serious issues of law and policy to be addressed by concerned parents and teachers." *Id.* ¶ 98.

Plaintiffs' amended complaint requests various types of relief, including declaratory judgment, compensatory and punitive damages, injunctive relief to prohibit the provision of resources to Two Rivers until defendants cease their discriminatory practices, and appointment of a Special Master to recommend further relief.

## II. ANALYSIS

Defendants have splintered into four groups, each of which has filed a motion to dismiss presenting numerous assertions as to why plaintiffs' amended complaint must be dismissed. These arguments, which are discussed in detail below, include lack of standing, failure to state a claim, and immunity from suit.

### A. Standing

The constitutional requirement of standing has three elements: (1) "injury in fact," which is "a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical"; (2) "causation," a "fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) "redressibility," a "likelihood that the requested relief will redress the alleged injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (internal citations and quotations omitted). Though the party asserting jurisdiction, here plaintiffs, always carries the burden of demonstrating constitutional standing, *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990), when the defendants, as here, challenge standing on a motion under Rule 12(b) of the Federal Rules of Civil Procedure, the court "must presume that the

general allegations in the complaint encompass the specific facts necessary to support those allegations." *Steel Co.*, 523 U.S. at 104 (citing *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

As plaintiffs bring many claims against defendants, it is necessary to analyze the standing issue with regard to each claim. *See, e.g.*, *Grand Council of the Crees v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000) ("[W]e address [plaintiffs'] standing to bring each claim in turn."). The court finds that plaintiffs have satisfied the requirements of standing in this case with regard to many of their claims. Specifically, the allegations in plaintiffs' amended complaint are sufficient to establish their standing to bring Counts Two through Five. Those counts challenge the diversion of funding and other resources from non-chartered public schools in the District to charter schools, the denial of an adequate education, the *de facto* segregation in the District's public schools, and the failure to provide due process with regard to plaintiffs' complaints. For each of these claims, plaintiffs' children (or in the case of Save Our Schools, its members' children) are alleged to have suffered a concrete "injury in fact" by the simple fact that they are students in the District's allegedly segregated, under-funded, inadequate, and mismanaged public school system. This injury is alleged to have been caused by defendants and would be redressible by this court were the court to grant the relief sought by plaintiffs.[6]

That said, plaintiffs do not have standing to challenge certain claims in Count One of their amended complaint. Count One alleges that (1) the admissions policy at Two Rivers is discriminatory and (2) as a result, defendants conspired to treat Two Rivers more favorably than

---

[6] Because its members have standing, so too does Save Our Schools. *See Arizonans for Official English v. Ariz.*, 520 U.S. 43, 65–66 (1997) ("An association has standing to sue or defend [in a representational capacity] if its members would have standing in their own right.").

other non-chartered public schools.  While plaintiffs have standing to challenge the latter claim,

because they were assertedly injured by the redirection of funds from the schools their children

attend, plaintiffs do not have standing to challenge the former claim.

None of the individual plaintiffs' children are alleged to have applied to, or been deterred

from applying to, Two Rivers.  In fact, all seven of these students attend grades higher than third

grade, the highest grade available at Two Rivers and, therefore, are not even eligible to attend

Two Rivers.[7]  Finally, and importantly, the complaint never alleges that the students at issue ever

intended to apply to Two Rivers were its assertedly discriminatory practices to end.

Consequently, defendants correctly argue that plaintiffs' claims attacking the alleged

discriminatory admissions policies must be dismissed because plaintiffs' children cannot claim to

have actually been injured by those practices.

Supreme Court precedent involving Article III standing makes clear that a plaintiff must

have either applied for admission or have been "able and ready" to apply in order to challenge an

organizations' assertedly discriminatory admissions policy.  *See, e.g.*, *Allen v. Wright*, 468 U.S.

737, 755 (1984) (holding that parents of children who had never applied for admission to private

schools with allegedly racially discriminatory admissions policies lacked standing to challenge the

tax-exempt status of those private schools); *Moose Lodge No. 107 v. Irvus*, 407 U.S. 163, 166–67

(1972) (Black plaintiffs who had never applied for membership to Moose Lodge lacked standing

to challenge club's all-white membership requirement).  More recently, in *Gratz v. Bollinger*, 539

---

[7] Plaintiffs' amended complaint indicates that one of the seven students currently attends an elementary school that includes grades as high as fifth grade.  Am. Compl. ¶ 23.  The complaint fails to clarify whether this student is of an eligible age to attend Two Rivers.  At the hearing on defendants' motions, counsel for plaintiff clarified that this student is in fact too old to attend Two Rivers.

U.S. 244 (2003), a decision that struck down the University of Michigan's undergraduate affirmative action policy, the Supreme Court clarified the contours of Article III standing as it relates to cases challenging school admissions policies. One of the issues in *Gratz* was whether the plaintiff had standing to challenge the undergraduate admissions process at the University of Michigan given that he had already enrolled at another institution by the time he filed suit and had never re-applied to the University of Michigan. Justice Stevens expressed the view that the lack of evidence in the record that the plaintiff "would receive any benefit from the prospective relief" sought by his lawyer precluded the plaintiff from having standing. *Id.* at 282 (Stevens, J., dissenting). Chief Justice Rehnquist, writing for the majority, disagreed. The Court's majority opinion states that it is "well established that intent may be relevant to standing in an Equal Protection challenge." *Id.* at 261. Because the plaintiff in *Gratz* intended to transfer to the University of Michigan when the University ceased using race as a factor in its admissions policies, he was therefore "able and ready" to apply. When such an intent is present, the "'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier." *Id.* at 262.

Here, unlike the plaintiff in *Gratz*, plaintiffs have not indicated that their children intend to apply to Two Rivers upon cessation of its allegedly discriminatory admissions process. Nor could they, since they are all too old to enroll at Two Rivers. Given this, the court concludes that none of the individual plaintiffs have standing to challenge Two Rivers' discriminatory admissions process.[8] This, however, does not preclude plaintiffs' challenge to defendants' asserted support

---

[8] Save Our Schools likewise lacks standing to challenge the admissions policies at Two Rivers, for the organization itself has not suffered an injury in fact, *see Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433–34 (D.C. Cir. 1995), nor have they alleged that any of their

of Two Rivers at the expense of other non-chartered public schools.  Plaintiffs have adequately

alleged that they were injured by the redirection of funds and resources from their schools to Two

Rivers.  *See, e.g.*, Am. Compl. ¶ 22 (plaintiffs were injured by the "inequities of funding in DC

that give more resources to charter schools [like Two Rivers] than public schools."); *id.* ¶ 23

(alleging that plaintiffs' children were "deprived of the numerous programs and funding benefits

provided with public funds to the students at Two Rivers"); *id.* ¶ 24 (same).  While these

allegations are conclusory, the court at this stage of this litigation must presume that the complaint

"encompass[es] the specific facts necessary to support" these allegations.  *Steel Co.*, 523 U.S. at

104.  Beyond alleging injury, plaintiffs also allege that this redirection of funds and resources was

caused by the defendants named in Count One (including Two Rivers[9]) and would be redressible

by favorable action from this court. The court, therefore, concludes that plaintiffs have met their

burden of alleging the elements of standing with regard to this limited aspect of Count One.[10]

Finally, although it is an extremely close call, the court rejects Spellings's argument that

plaintiffs lack standing to sue her because her involvement in plaintiffs' alleged injuries is too

---

members was rejected from Two Rivers, thereby giving rise to associational standing.  *See id.* at
1435; *Nat'l Coalition for Students with Disabilities v. Miller*, 298 F. Supp. 2d 16, 20 (D.D.C.
2002).

[9]  Beyond having a discriminatory admissions process, Two Rivers is also alleged to have
participated in a conspiracy with the other defendants "to obtain public resources to support a
school with a discriminatory admissions process."  Am. Compl. ¶ 66.

[10]  Plaintiffs, of course, retain the burden of presenting, during the later stages of this
litigation, evidence to establish that they have been injured in fact by defendants' alleged support
of Two Rivers.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ("[E]ach element [of
standing] must be supported in the same way as any other matter on which the plaintiff bears the
burden of proof, i.e., with the manner and degree of evidence required at the successive stages of
the litigation.").

attenuated.  The gravamen of plaintiffs' complaint, as it relates to Spellings, is that her

implementation of NCLB and the D.C. Choice Incentive Program ("D.C. Choice"),  Pub. L. No.

108-199, Div. C, Title III, has led, albeit indirectly, to the decreased funding of D.C.'s non-

chartered public schools.  This is so with regards to NCLB, according to plaintiffs, because NCLB

provides funds to DCPS in exchange for an agreement by DCPS to comply with certain provisions

of the Act.  The main provision of NCLB of which plaintiffs complain provides that schools that

fail to make "adequate yearly progress" must give students from low-income families the option

of obtaining supplemental educational services from a public- or private-sector vendor with

federal funds.  20 U.S.C. § 6316.  Under this circumstance, DCPS is required to use its money to

support these "supplemental educational services," which often are privately run, thereby

decreasing the funds available for public schools.  D.C. Choice also allegedly diverts federal funds

from public schools by providing vouchers to low-income District students to attend *private*

elementary or secondary schools.

It is undisputed that these programs can result in money being siphoned away from

underperforming public schools in the District.  Such re-direction of funds is, in the court's view,

not a "conjectural" injury, is fairly traceable to Spellings's implementation of the various funding

statutes, and would be redressed by the court's adoption of plaintiffs' requested relief.  *See Sch.*

*Dist. v. Spellings*, 2005 U.S. Dist. LEXIS 29253, at *8–10 ( E.D. Mich. Nov. 23, 2005) (rejecting

argument that the plaintiffs lacked standing to sue Spellings for her implementation of NCLB).

Whether such "re-direction" is sufficient to state a claim, however, is a separate inquiry.

Ultimately, though, the court need not reach that question for, as discussed below, the claims

against Spellings must be dismissed for other independent reasons.

**B. Claims Against Spellings**

Plaintiffs concede in their opposition that the "Fifth Amendment is the sole basis for any claim they have against Defendant Spellings." Pls.' Opp'n at 52. Further, plaintiffs attempt to hold Spellings liable for violation of the Fifth Amendment by way of 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Because plaintiffs fail to state a claim against Spellings under either of these statutes, these claims must be dismissed.

Plaintiffs' claims under both § 1981 and § 1983 fail because Spellings's actions were taken under color of federal law, not state law. Section 1981, by its terms, only applies to "nongovermental" action and action "taken under color of *State* law." 42 U.S.C. § 1981(c) (emphasis added). Section 1983 is more limited, applying solely to action taken "under color of" state or D.C. law. 42 U.S.C. § 1983.[11] Neither § 1981 nor § 1983 applies to federal officers acting under color of federal law. *See Brown v. United States*, 271 F. Supp. 2d 225, 229 (D.D.C. 2003) (listing cases that hold that § 1981 "does not address [alleged] impairment by the federal government.") (internal quotation omitted); *Saddler v. D'Ambrosio*, 759 F. Supp. 4, 8–9 (D.D.C. 1990) ("Actions under color of federal law are not cognizable under 42 U.S.C. § 1983."). Here, there is no dispute that Spellings's actions, taken pursuant to her role as the Secretary of

---

[11] Spellings, citing *Dist. of Columbia v. Carter*, 409 U.S. 418 (1973), argues that § 1983 does not apply to action taken under color of D.C. law, thereby suggesting that plaintiffs' constitutional claims against *all* defendants must be dismissed. Spellings's Mot. at 14–17. Spellings fails, however, to note that Congress superceded the holding in *Carter* by amending 42 U.S.C. § 1983 in 1979 to include actions taken under color of D.C. law. *See* Pub. L. No. 96-170, 93 Stat. 1284 (1979).

Education, were taken under color of federal law.  Therefore, plaintiffs' constitutional claims against Spellings must be dismissed.[12]

## C.  Claims Against Board of Education, DCPS, and the Public Charter School Board

Plaintiffs name the D.C. Board of Education, DCPS, and the D.C. Public Charter School Board as defendants in this suit.  However, case law makes clear that none of these entities is a suable entity.  *See Kundrat v. Dist. of Columbia*, 106 F. Supp. 2d 1, 7 (D.D.C. 2000) (noting the "overwhelming weight of precedent in this Circuit which holds that, in the absence of explicit statutory authorization, bodies within the District of Columbia government are not suable as separate entities") (internal quotation omitted); *see also Winder v. Erste*, 2005 U.S. Dist. LEXIS 5190, at *11 (D.D.C. Mar. 31, 2005) ("DCPS is not a suable entity under the D.C. Code"); *Tschanneral v. D.C. Bd. of Educ.*, 594 F. Supp. 407, 409 (D.D.C. 1984) ("Since the statute establishing the District of Columbia Board of Education . . . does not provide that the Board of Education may sue or be sued, the Board is not a suable entity."); *Kelley v. Morris*, 400 A.2d 1045, 1047 (D.C. 1979) (same).  Therefore, the claims against these three entities of the District government—the Board of Education, DCPS, and the Public Charter School Board—are dismissed.

---

[12] *Bivens v. Six Unknown Named Agents of Fed. Bur. of Narcotics*, 403 U.S. 388 (1971), provides a cause of action for constitutional violations by federal officers.  Plaintiffs did not allege a *Bivens* action in their amended complaint.  In some cases, courts in this jurisdiction have construed *pro se* complaints alleging § 1983 claims as *Bivens* actions.  *See, e.g.*, *Reynolds El v. Husk*, 273 F. Supp. 2d 11, 12 n.1 (D.D.C. 2002).  The complaint in the instant case, however, was not filed by a *pro se* litigant; plaintiffs have at all times been represented by counsel.  Therefore, this court declines to liberally construe plaintiffs' causes of action against Spellings as *Bivens* actions.  *See Williams v. U.S. Gov't Printing Office*, 2003 U.S. Dist. LEXIS 26544, at *9–10 (D.D.C. Oct. 1, 2003).

**D.  Failure to State a Claim**

Defendants have also all moved to dismiss under Rule 12(b)(6) of the Federal Rules of

Civil Procedure, arguing that the allegations in plaintiffs' amended complaint fail to state a claim.

A court may grant a motion to dismiss under Rule 12(b)(6) only if it is clear that no relief could be

granted under any set of facts that could be proved consistent with the allegations.  *Kowal v. MCI*

*Commc'ns, Inc.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also Conley v. Gibson*, 355 U.S. 41,

45–46 (1957) (stating that a complaint should not be dismissed "unless it appears beyond doubt

that the plaintiff can prove no set of facts in support of his claim which would entitle him to

relief").  In addition, the court must construe the complaint in a light most favorable to the

plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual

allegations.  *In re United Mine Workers Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915

(D.D.C. 1994); *see Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (stating that the

court must give the plaintiff "the benefit of all inferences that can be derived from the facts

alleged").

*1. Count One*

Count One of plaintiffs' amended complaint alleges both that the admissions policies at

Two Rivers are racially discriminatory and that, because of that discrimination, defendants

provided favorable treatment to Two Rivers at the expense of other non-chartered public schools.

Because the court has already concluded that plaintiffs do not have standing to challenge the

former claim,[13] it will focus solely on the latter claim.

---

[13]  Plaintiffs' amended complaint states that the Human Rights Act claim in Count One is
directed solely at Two Rivers' allegedly discriminatory admissions policy.  Am. Compl. ¶ 68.
Nonetheless, plaintiffs' opposition suggests that the Human Rights Act claim may be extended to

a. <u>Allegations</u>

The amended complaint alleges that defendants Wells and Ambrose were "aware of the goal of Two Rivers to create a school where no single race was in the majority . . . and both of them provided assistance and public resources to Two Rivers." Am. Compl. ¶ 59.  Wells is alleged to have "confirmed publically [*sic*] that he understood that the Two Rivers' founders were seeking to create a school where African-Americans were not in the majority." *Id.*  At one point, Wells allegedly "stated that Two Rivers' founders and parents felt that the public schools were 'too black.'" *Id.*  Armed with this knowledge, plaintiffs assert that Wells nonetheless "provided his time, at public expense, and other public resources to assist the Two Rivers school in obtaining a public school building." *Id.* ¶ 60.  Originally, Wells worked with Ambrose to "blackmail" the owner of a different school to provide Two Rivers with space.  When that failed, Wells allegedly engaged in "an unlawful process to provide the Van Ness Elementary School to Two Rivers," which also ultimately failed. *Id.*

Some time thereafter, Two Rivers assertedly released the demographics of the students confirmed for enrollment, indicating that 45% of the enrollees would be White, 40% Black, 10% Latino, and the remaining 5% Asian.  Plaintiffs allege that "public school advocates wrote to each of the concerned public entities and officials" urging them not to support Two Rivers. *Id.* ¶ 64.  Therefore, "each of the Defendant public agencies" are alleged to have been on "specific notice of the discriminatory impact of the Two Rivers' admissions process." *Id.*

---

hold other defendants liable under an aiding and abetting theory of liability.  However, because plaintiffs lack standing to challenge the underlying policy, the Human Rights Act claim in Count One is dismissed with regard to all defendants.

"Despite this specific notice," Superintendent Rice assertedly recommended providing Two Rivers with space at Eliot Junior High School at a July 21, 2004 meeting of the D.C. School Board. *Id.* Council member Wells is alleged to have been a "proponent of providing the space at Eliot to Two Rivers." *Id.* Every member of the Board of Education, except one,[14] voted to support the provision of public resources to Two Rivers, each of which allegedly "had specific knowledge of the discriminatory impact of the Two Rivers' admissions process." *Id.* Mayor Williams and the D.C. Council, who were also alleged to have had "knowledge of the discriminatory admissions process," awarded a $1 million "City Build" grant to Two Rivers. *Id.* The D.C. Charter School Board, which was also given "specific notice" of the discriminatory impact of Two Rivers' admissions process, allegedly "refused to revoke the Two Rivers' charter, and refused to hold a hearing to investigate" that process. *Id.* ¶ 65. Finally, Two Rivers itself is alleged to have "engaged in joint action or a conspiracy" with the other defendants to "obtain public resources." *Id.* ¶ 66.

　　　　b. <u>Sufficiency of Allegations</u>

Plaintiffs argue that the above allegations are sufficient to present a "legally-viable equal protection claim . . . against Two Rivers and the DC Defendants."[15] Pls.' Opp'n at 20. The equal

---

[14] The sole member of the Board of Education who did not vote to support the provision of public resources to Two Rivers was William Lockridge. Plaintiffs make clear that the reason that he is not named as a defendant in this action is because he did not so vote. Pls.' Opp'n at 31.

[15] Plaintiffs' amended complaint states that the allegations in Count One constitute a violation of their due process rights as well. Am. Compl. ¶ 64–66. At least one of the defendants challenged the viability of that claim, Two Rivers' Mot. at 18, which plaintiffs' opposition fails to contest. Instead, plaintiffs' opposition only defends the viability of the constitutional claims in Count One under equal protection theories. Therefore, plaintiffs are deemed to have conceded that Count One does not allege a viable due process claim.

protection principles embodied in the Fifth Amendment prohibit a state from "'deny[ing]' to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).[16]  When assessing an equal protection challenge, official action is "presumed to be valid" and must be sustained if the classification drawn by the action is "rationally related to a legitimate state interest." *Id.* at 439–40.  Any such presumption, however, falls away when the challenged official action "classifies by race, alienage, or national origin," or impinges on personal rights protected by the Constitution.  *Id.* at 440.  In such cases, the state action is subjected to strict scrutiny and will be upheld only if the classification is "suitably tailored to serve a compelling state interest." *Id.*

As the Supreme Court has held, it is "clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977).  Rather, "[p]roof of racially discriminatory intent or purpose is required to show a violation" of the equal protection principles embodied in the Fifth Amendment.  *Id.* at 265; *see also Brown v. Califano*, 627 F.2d 1221, 1234 n.78 (D.C. Cir. 1980) ("Recent Supreme Court cases have made clear that proof of discriminatory intent, not just disproportionate impact, is necessary to establish an equal protection violation of constitutional dimensions.").  Such an "invidious discriminatory purpose may often be inferred from the totality of the relevant facts," *Washington v. Davis*, 426 U.S. 229,

---

[16]  By its language, the Fourteenth Amendment only applies to states and not to the District of Columbia.  Nonetheless, courts have found that the Due Process Clause of the Fifth Amendment, which applies to the federal government and the District of Columbia, "contains an equal protection component." *Washington v. Davis*, 426 U.S. 229, 239 (1976) (citing *Bolling v. Sharpe*, 347 U.S. 497 (1954)); *see also Pitts v. Meese*, 684 F. Supp. 303, 304 n.3 (D.D.C. 1987).

242 (1976), and requires a "sensitive inquiry into such circumstantial and direct evidence of intent

as may be available." *Arlington Heights*, 429 U.S. at 266.

Defendants argue that plaintiffs' amended complaint fails to allege that defendants acted

with any discriminatory intent or purpose and that, therefore, the equal protection claim in Count

One must be dismissed.  While defendants are correct that plaintiffs' amended complaint never

explicitly alleges any discriminatory purpose—instead it focuses on the "discriminatory impact"

of Two Rivers' admissions policy and knowledge of the discriminatory impact of that policy by

the defendants[17]—it is nonetheless a reasonable inference from the facts that are alleged that

defendants acted with discriminatory intent or purpose in supporting Two Rivers.  Allegations that

government actors knew a particular charter school sought a "diverse" student body so that its

student population would not be "too black" and thereafter approved the provision of resources

and funding to that school are sufficient to give rise to a reasonable inference that those state

actors did so with discriminatory intent.  Moreover, it is simply true that certain "issues including

state of mind (e.g., intent) are often unsuitable for a Rule 12(b)(6) motion to dismiss." *Pryor v.

NCAA*, 288 F.3d 548, 565 (3d Cir. 2002).

As such, at this stage of this litigation, it is too early to conduct the "sensitive inquiry"

required by the Supreme Court to determine whether defendants' conduct was free from

discriminatory purpose.  *Arlington Heights*, 429 U.S. at 266.  Plaintiffs' allegations of

---

[17]  *See, e.g.,* Am. Compl. ¶ 64 ("[E]ach of the Defendant public agencies was provided
with specific notice of the discriminatory impact of the Two Rivers' admissions process"); *id.*
(members of the D.C. School Board who voted to provide public resources to Two Rivers "had
specific knowledge of the discriminatory impact of the Two Rivers' admissions process"); *id.* ¶
65 ("The DC Charter School Board was also provided specific notice of the discriminatory
impact of the Two Rivers' admissions process.").

discriminatory intent and conspiracy to support a racially discriminatory school may prove to be

entirely untrue, but the Federal Rules of Civil Procedure entitle plaintiffs to an opportunity to

present specific facts in their support.  *See Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C.

Cir. 2004) ("It is of no moment that Warren's allegation of actual or constructive knowledge on

the part of the District was conclusory.  Many well-pleaded complaints are conclusory.") (citing 5

CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1218 (2d

ed. 1990)).  Accordingly, the court rejects the argument in the various motions to dismiss that

Count One must be dismissed for failing to allege a discriminatory purpose.[18]

### c.  Immunity

Defendants argue that, to the extent that plaintiffs' claims survive the motions to dismiss,

"almost all of the individual and agency defendants are entitled to immunity."  District's Mot. at

33–40; *see also* Council's Mot. at 19–22.

First, the Council defendants assert that Ambrose and Chavous, the two council member

defendants, enjoy absolute immunity from personal liability.  The court agrees.  It is a long-held

principle of common law that "state and regional legislators are entitled to absolute immunity

---

[18]  The District defendants argue that, to the extent plaintiffs' amended complaint seeks to impose liability on the District itself (through the official-capacity suits against the individual defendants, presumably), it must be dismissed for failure to allege that the constitutional deprivation at issue was the result of an official policy or custom of the District.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *see also Triplett v. Dist. of Columbia*, 108 F.3d 1450, 1453 (D.C. Cir. 1997) ("Under § 1983, a municipality is liable . . . only for constitutional torts arising from action pursuant to official municipal policy.").

An individual's actions may constitute "official municipal policy" if the person has "'final policymaking authority [under] state law.'"  *Triplett*, 108 F.3d at 1453 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)).  Here, it is hard to imagine who has greater policymaking authority with regard to the governance of the District's public schools than the defendants named in this case.  As such, the court rejects this argument.

from liability under § 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998); *Gross v. Winter*, 876 F.2d 165, 169 (D.C. Cir. 1989) (holding that "District councilmembers may invoke the same immunities as their state counterparts."). Such absolute legislative immunity attaches to all actions taken "'in the sphere of legitimate legislative activity.'" *Bogan*, 523 U.S. at 54 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Whether an act is legislative "turns on the nature of the act, rather than on the motive or intent of the official performing it." *Id.* Under these standards, it is clear that council members Ambrose and Chavous enjoy absolute immunity from plaintiffs' claims. Plaintiffs' amended complaint accuses the Council defendants of doing nothing more than supporting the efforts of Two Rivers to obtain housing and public resources, albeit with a discriminatory intent. It is undeniable that these actions are legislative, rather than administrative, in nature. Accordingly, defendants Ambrose and Chavous enjoy absolute immunity from personal liability.[19]

Second, defendants argue that the remaining individual defendants named in their personal capacities are shielded from liability by the common law doctrine of qualified immunity. The Supreme Court has made clear that qualified immunity "is an *immunity from suit* rather than a mere defense to liability"; thus, questions of immunity should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (emphasis in original). The legal standard for determining whether officials are entitled to qualified immunity is as follows: "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

---

[19] Defendants Ambrose and Chavous, however, may still be held liable in their official capacities, as the defense of absolute immunity in unavailable in official-action suits. *Ky. v. Graham*, 473 U.S. 159, 167 (1985).

constitutional rights of which a reasonable person would have known." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18 (1982)).  This is an objective standard.  "Evidence concerning the defendant's subjective intent is simply irrelevant" to the defense of qualified immunity, even if such evidence is an essential element of plaintiff's affirmative case.  *Id.*

Applying this standard, the first inquiry is whether the individual defendants' conduct was "discretionary."  If not, then qualified immunity is no defense.  As the D.C. Circuit has explained, courts "generally define 'discretionary' acts as those involved in the formulation of policy, while 'ministerial' acts are defined as those related to the execution of policy."  *Rieser v. Dist. of Columbia*, 563 F.2d 462, 475 (D.C. Cir. 1977).  Plaintiffs do not dispute that defendants' conduct was discretionary.[20]

The next step in determining whether defendants are entitled to qualified immunity requires an analysis of whether defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  *Crawford-El*, 523 U.S. at 588 (quoting *Harlow*, 457 U.S. at 817–18).  Whether a statutory or constitutional right was clearly established at the time of the official's conduct is "an 'essentially legal question.'"  *Id.* at 589 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526–29 (1985)).

It is not enough simply to allege the violation of a clearly established but conceptually broad right, such as the right to Due Process, or the right to equal protection under the law.  *See*

---

[20]   The laws at issue here—such as the statute that leaves to the discretion of the members of the Board of Education whether to grant collocation to Two Rivers—fail specifically to prescribe or proscribe defendants' support of Two Rivers.  *Cf. Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984) ("A law that fails to specify the precise action that the official must take in each instance creates only discretionary authority . . . .").

*Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987).  Rather, "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Id.* at 640; *see also Harris v. Dist. of Columbia*, 932 F.2d 10, 13 (D.C. Cir. 1991).  As the Court of Appeals for this Circuit has explained, "Government officials who violate a plaintiff's civil rights are entitled to qualified immunity if the officials reasonably could have believed that their actions were lawful in light of clearly established federal law and the information available to them at the time the actions took place."  *Samaritan Inns, Inc. v. Dist. of Columbia*, 114 F.3d 1227, 1238–39 (D.C. Cir. 1997).

While it is beyond reprieve that the Constitution has long prohibited governmental support of segregated schools, *see Cooper v. Aaron*, 358 U.S. 1, 19 (1958) ("State support of segregated schools through any arrangement, management, funds, or property cannot be squared" with equal protection principles), the court does not read plaintiffs' amended complaint to allege government support of a *segregated* school.  Rather, defendants are accused of supporting a charter school that sought a diverse and *de*-segregated student population.  To wit, the general student population in the District's public schools is more than 80% Black, while Two Rivers' student population was expected to be 45% White, 40% Black, 10% Latino, and 5% Asian.  Moreover, plaintiffs acknowledge in their amended complaint that Two Rivers' intention was to increase "diversity," Am. Compl. ¶ 44, rather than to promote segregation, at its school.  Therefore, the case law prohibiting support of segregated schools is inapplicable.

At best, plaintiffs' amended complaint challenges the governmental support of a charter school with a racially conscious admissions policy that was intended to increase the percentage of

White students in order to guarantee diversity of the school's student body.  The Supreme Court

has made clear that race-conscious admissions policies designed to promote diversity in higher

education do not necessarily violate equal protection principles.  *Grutter v. Bollinger*, 539 U.S.

306 (2003).  In *Grutter*, the Supreme Court explicitly held that "student body diversity is a

compelling state interest that can justify the use of race" in a competitive university admissions

process.  *Id.* at 325.  Since that time, appellate courts have likewise concluded that race-conscious

admissions policies in public schools can survive strict scrutiny.  *See, e.g.*, *Parents Involved in*

*Cmty. Sch. v. Seattle Sch. Dist., No. 1*, 426 F.3d 1162, 1166 (9th Cir. 2005) (en banc) ("We

conclude that the District has a compelling interest in securing the educational and social benefits

of racial (and ethnic) diversity, and in ameliorating racial isolation or concentration in its high

schools by ensuring that its assignments do not simply replicate Seattle's segregated housing

patterns."); *McFarland v. Jefferson County Pub. Schs.*, 416 F.3d 513, 514 (6th Cir. 2005) (per

curiam) (affirming that the use of racial guidelines in a public school's student assignment plan

"met the constraints of the Equal Protection Clause of the Fourteenth Amendment because the

school board had a compelling interest to use the racial guidelines and applied them in a manner

that was narrowly tailored to realize its goals").[21]

Given these holdings, the court cannot conclude that defendants' alleged support and

funding of a public charter school with an assertedly race-conscious admissions process that was

intended to increase the diversity of its student population violated any "clearly established

statutory or constitutional rights of which a reasonable person would have known."  *Crawford-El*,

---

[21] On June 5, 2006, the Supreme Court granted certiorari in these two cases, *see* Order
List, 547 U.S. ___, further confirming that the issue is not "clearly established."

523 U.S. at 588.[22]   Therefore, the doctrine of qualified immunity protects the individual

defendants from being personally liable for the surviving claims in Count One of plaintiffs'

amended complaint.[23]

### 2. Count Two

Count Two of plaintiffs' amended complaint, rather than focusing on government support

for Two Rivers specifically, attacks the entire charter school system in the District, arguing that

defendants "favor charter schools over public schools," "force, or allow, the closure of public

schools because they are permitted to fail," and "sacrific[e] the students remaining in public

schools, who either are trusting that the Defendant public officials are working to improve the

public schools, or who are not aware of options to opt out of failing public schools."  Am. Compl.

¶ 70.  Specifically, plaintiffs challenge the "various funding provisions imposed by Congress,

Defendants DC Council, the Mayor, and DC Board of Education that result in higher per pupil

expenditures available for charter schools than for public schools," *id.* ¶ 71, and the "provision of

public buildings and other public resources" to charter schools.  *Id.* ¶ 73.

Plaintiffs allege that, because many of the students in D.C.'s non-chartered public schools

are low income and Black, this disparity in treatment is a "violation of Equal Protection,"

---

[22]   Importantly, the court today makes no finding with regard to whether allegations that government actors supported a charter school with a racially conscious admissions process are sufficient to state a claim.

[23]   Because the court concludes that the individual defendants are entitled to qualified immunity, it need not resolve the District defendants' additional assertion that the individual members of the D.C. Board of Education are immune for their official actions taken in good faith.  *See* D.C. Code § 38-104 ("The members of the Board of Education of the District of Columbia shall not be personally liable in damages for any official action of the Board performed in good faith in which the members participate.").

actionable under 42 U.S.C. § 1983, Am. Compl. ¶ 76, and the Human Rights Act. *Id.* ¶ 77.

Plaintiffs also allege that this is "a denial of due process of law." *Id.* at ¶ 76.

      a. <u>Equal Protection</u>

Plaintiffs' equal protection claim in Count Two requires a different result than their similar

claim in Count One.  As opposed to Count One, which alleged that defendants supported a

particular discriminatory charter school, Count Two contends that the disparate treatment in favor

of the charter school system as a whole is a violation of Equal Protection given that "more than

84.4% of the students in DC public schools are African-American."  Am. Compl. ¶ 76.

Defendants seek to dismiss this count, arguing that the "various funding provisions imposed by"

defendants, *id.* ¶ 71, or the "provision of public buildings and other public resources" to charter

schools, *id.* ¶ 73, are not facially discriminatory and that plaintiffs have failed to allege any

discriminatory intent underlying these official acts.  District's Mot. at 12–16; Council's Mot. at

16–17; Two Rivers' Mot. at 17–18.  The court agrees with defendants because the allegations in

plaintiffs' amended complaint with regards to Count Two are incompatible with an inference of

discriminatory purpose.

Disregarding the numerous legal conclusions that pervade plaintiffs' amended complaint,

*see Warren*, 353 F.3d at 39, plaintiffs' amended complaint is devoid of a single factual allegation

that the District's charter school system, as a whole, has a racially discriminatory purpose.  While

this silence is not necessarily dispositive, given that plaintiffs are only required to provide "a short

and plain statement of the claim" in order to survive a 12(b)(6) motion, *Swierkiewicz v. Sorema*

*N.A.*, 534 U.S. 506, 512 (2002), the allegations that are present in plaintiffs' amended complaint

contradict and preclude any inference that defendants' actions with regard to the entire charter school system were motivated by a discriminatory purpose.

Attempting to explain the origin of the asserted segregation at the District's charter schools, plaintiffs point to "mismanagement, entrenched bureaucracies, incompetent leadership, and perhaps most significant, overlapping and unclear lines of authority between the various public servants charged with the future of DC's children." Am. Compl. ¶ 1.  As plaintiffs concede, any discriminatory effect of the charter school system results from defendants' "negligence," *id.* ¶ 3, and not from defendants' discriminatory intent or purpose.  By specifically naming incompetence and negligence as the culprit, plaintiffs have foreclosed any inference that discriminatory intent is the motivating factor behind plaintiffs' injuries, thereby pleading themselves out of a viable equal protection claim.  For this reason, the allegations in Count Two of plaintiffs' amended complaint fail to state a claim for violation of plaintiffs' equal protection rights as embodied in the Fifth Amendment.

  b.  Human Rights Act

  Count Two also alleges a claim under the Human Rights Act, D.C. Code § 2-1402.41. Section 2-1402.41(1) makes it unlawful for an educational institution:

> [t]o deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, political affiliation, source of income, or disability of any individual.

By its terms, Section 2-1402.41 is confined to educational institutions and therefore can only be pressed against Two Rivers, the sole defendant herein that is an educational institution.

26

Two Rivers is allegedly culpable under the Human Rights Act because it "has a greater per pupil funding than neighborhood public schools, it is able to offer free non-essential day care for three-year-olds, comprehensive art classes, low student-teacher ratios, full time aides in all classrooms, and language instruction."  Am. Compl. ¶ 72.  Plaintiffs also allege that Two Rivers is culpable because it occupies space at Eliot, *id.* ¶ 73, and received a grant from the D.C. Council and Mayor Williams.  *Id.* ¶ 74.

Mere receipt of benefits from the government does not violate D.C. Code § 2-1402.41. Rather, Two Rivers must itself deny, restrict, abridge or condition the use of its programs or facilities to any qualified person in order for a violation to arise.  The receipt of funds from the government and the resulting ability to offer certain programs and benefits to *all* its students, regardless of race, does not constitute a violation of the Human Rights Act.[24]  Therefore, plaintiffs have failed to state a claim under the Human Rights Act in Count Two against Two Rivers.

c. Due Process

The due process clause of the Fifth Amendment guarantees that no person shall be deprived "of life, liberty or property without due process of law."  U.S. CONST. amend. V.  It is well established that there are two types of due process claims—substantive and procedural.  As plaintiffs never clarify which of these are being pressed in Count Two, the court will analyze the viability of both.

---

[24]  Moreover, to the extent that these allegations are derivative of the claim that Two Rivers has a discriminatory admissions process, plaintiffs lack standing to so challenge.

i. Procedural Due Process

"An essential principle of [procedural] due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Therefore, for a plaintiff to survive a motion to dismiss under Rule 12(b)(6), he must allege, at a minimum, that he has been deprived of either a life, liberty, or property interest protected by the due process clause. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570–72 (1972).

Given plaintiffs' inartful amended complaint, it is difficult to determine what interest is implicated in Count Two. The court presumes, based on the allegations in Count Two, that plaintiffs assert that they have a property interest in equal funding and equal support of all the District's schools, and that they were deprived of this interest by defendants' approval and administration of policies that allow increased funding and support for the District's charter schools.[25] Ultimately, however, the court need not determine whether plaintiffs have been deprived of such an interest, because, even assuming *arguendo* that they have been, there is no

---

[25] To have a legally viable procedural due process claim, plaintiffs must have a "legitimate claim of entitlement" to this property interest, rather than an abstract need or desire for it. *Roth*, 408 U.S. at 577; *Doe by Fein v. Dist. of Columbia*, 93 F.3d 861, 868 (D.C. Cir. 1996); *Stewart v. Gaines*, 370 F. Supp. 2d 293, 295–96 (D.D.C. 2005). To determine whether such a "legitimate claim of entitlement" to such a property interest exists, courts are instructed to look not at the Constitution, but rather at "existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577.

Here, D.C. Code § 38-1804.01(b)(2) requires that the District's charter schools and non-chartered public schools receive uniform per capita funding. Arguably, this statute could be read to create a "legitimate claim of entitlement" to a public school system wherein students at charter and non-chartered public schools receive uniform funding.

28

indication that plaintiffs were "exceptionally affected . . . upon individual grounds" by the official

actions of defendants.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 446 (1915).

In *Bi-Metallic*, the Supreme Court made clear that:

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption.  The Constitution does not require all public acts to be done in town meeting or an assembly of a whole.  General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard.  Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Id.* at 445.  Here, plaintiffs fail to allege that the state action at issue affected them individually.

Rather, the "rules of conduct" that allegedly resulted in the provision of greater funding and

resources for D.C.'s charter schools than for its non-chartered public schools affected plaintiffs in

the same manner as they affected all other students in D.C.'s non-chartered public schools.

Therefore, procedural due process protections are not triggered, *Individual Reference Servs.*

*Group, Inc. v. FTC*, 145 F. Supp. 2d 6, 45 (D.D.C. 2001), and plaintiffs were not entitled to

notice, an opportunity to be heard, or any other procedural protections.  *See Loudermill*, 470 U.S.

at 546.

ii.  Substantive Due Process

Besides protecting procedural interests, the due process clause also "cover[s] a substantive

sphere as well, 'barring certain government actions regardless of the fairness of the procedures

used to implement them.'"  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998) (quoting

*Daniels v. Williams*, 474 U.S. 327, 331 (1986))).  Under substantive due process jurisprudence, a

government's attempt to deprive an individual of a "fundamental" right triggers strict scrutiny by

courts.  *See, e.g.*, *Hutchins v. Dist. of Columbia*, 188 F.3d 531, 536 (D.C Cir. 1999) (en banc)

("[A]ny government impingement on a substantive fundamental right . . . would be measured under a strict scrutiny standard and would be justified only if the infringement is narrowly tailored to serve a compelling state interest.").  Here, however, it is clear that plaintiffs have no fundamental right to equal treatment of charter schools and non-chartered public schools.  As defendants point out and plaintiffs ultimately concede, Pls.' Opp'n at 42, the Supreme Court has held that public education is not a fundamental right under the U.S. Constitution.  *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973); *Kardmas v. Dickinson Public Schs.*, 487 U.S. 450, 458 (1988) ("Nor have we accepted the proposition that education is a fundamental right, like equality of the franchise, which should trigger strict scrutiny when government interferes with an individual's access to it.").

When a fundamental right is not implicated, as here, substantive due process merely prohibits government action that results in a deprivation of a protected interest when that action fails to have some rational basis.  *Hutchins*, 188 F.3d at 563 ("[R]ational basis scrutiny applies to burdens on rights that do not qualify as fundamental.") (Rogers, J., dissenting) (citing *Wash. v. Glucksberg*, 521 U.S. 702, 728 (1997)).  The rational basis inquiry is "highly deferential," *Calloway v. Dist. of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000), and "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."  *FCC v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313 (1993).  The disparate treatment of the District's charter and non-chartered schools satisfies rational basis review, given that it is a legitimate purpose of the local government to attempt to improve educational opportunities in the District and that the current charter school

regime is a rational means for achieving such goals.[26]  Plaintiffs fail to meet their burden of

proving otherwise.  *Heller v. Doe*, 509 U.S. 312, 320 (1993) ("[T]he burden is on the one

attacking the legislative arrangement to negative every conceivable basis which might support

it.").

For these reasons, the court dismisses the due process claims in Count Two of plaintiffs'

amended complaint.[27]

---

[26] The major disparity of which plaintiffs complain is the fact that charter schools, unlike non-chartered public schools, need not contribute 11% of their overall budget to DCPS for "services."  Am. Compl. ¶ 5.  Contrary to plaintiffs' suggestion, this disparity has a rational basis; charter schools cannot obtain funding from the District's capital budget and therefore must pay for their own facilities.  The 11% credit to charter schools is meant to act as a "facilities allowance."  *See* District's Mot. at 7 (citing D.C. Public Charter School Board, "Funding Formula," available at http://www.dcpublliccharter.com/communityint/GEneral/funding.htm).  While the court cannot look to matters outside the pleadings to resolve defendants' motions to dismiss, the fact that such matters exist supports the conclusion that there is a "conceivable state of facts" that would render the 11% funding differential rational.  *Beach Commc'ns*, 508 U.S. at 313–14.

Moreover, the 11% credit does not, as plaintiffs suggest, violate District law.  The D.C. Code requires that the annual budget for all public schools, both chartered and non-chartered, be determined using the same per-pupil appropriation.  D.C. Code § 38-1804.01(b)(2).  The D.C. Code does not, however, require that all schools be charged the same administrative fees.  Because nothing in the record suggests that the District law requiring uniform funding is being violated, the court rejects plaintiffs' contention that the 11% disparity violates District law and therefore lacks a rational basis.

[27] Beyond requiring heightened judicial review of government action implicating fundamental rights, substantive due process protections have also been invoked to protect against the "exercise of power without any reasonable justification in the service of a legitimate governmental objective."  *County of Sacramento*, 523 U.S. at 846.  To the extent that plaintiffs' amended complaint can be read to allege that the District officials implemented or executed the charter school provisions "without any reasonable justification," that claim too would fail.  "In a [substantive] due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Id.* at 847 n.8.  Given these high standards, it is clear that plaintiffs' amended complaint fails to include any allegations that defendants committed any "abusive executive action of constitutional proportions."  *Yates v. Dist. of Columbia*, 324 F.3d 724, 726 (D.C. Cir. 2003).

### 3. *Count Three*

Count Three of plaintiffs' amended complaint alleges that "[s]tudents attending DC public schools, including those represented by Plaintiffs herein, are being denied their fundamental right to an education."  Am. Compl. ¶ 82.  By failing to deliver "quality education" to the students in D.C.'s non-chartered public schools and by causing those students to "lose further education resources relative to students in charter schools or private schools using public funds for vouchers," defendants are alleged to have violated the due process and equal protection rights embodied in the Fifth Amendment.  *Id.* ¶ 85.

As noted above, the Supreme Court has explicitly rejected plaintiffs' allegation that "[t]he right to an education is fundamental."  Am. Compl. ¶ 82.  *See, e.g.*, *Kadrmas*, 487 U.S. at 458; *Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a '"right' granted to individuals by the Constitution.");[28] *Rodriguez*, 411 U.S. at 33–36.  Because the viability of Count Three depends upon this premise being true, Count Three fails.[29]

---

[28]  Plaintiffs suggest that the Supreme Court's decision in *Plyler* requires the application of "intermediate scrutiny" to this case.  In *Plyler*, the Supreme Court applied such "intermediate scrutiny" to a statute prohibiting the disbursement of state funds for the education of children of undocumented aliens.  457 U.S. at 223–24.  The Court indicated that such heightened review was limited to the "unique circumstances" of that case; namely the intersection of a burden on education combined with the disadvantaging of children of undocumented aliens.  *Id.* at 239; *see also Kadrmas*, 487 U.S. at 459 (expressly limiting the holding in *Plyler* to those "unique circumstances").  Because this case does not involve such "unique circumstances," *Plyler* does not mandate the use of intermediate scrutiny in this case.

[29]  Plaintiffs correctly note that some state constitutions, either implicitly or expressly, elevate education to the level of being a fundamental right.  *See, e.g.*, *McDuffy v. Secretary*, 615 N.E.2d 516, 565 (Mass. 1993); *Campaign for Fiscal Equity, Inc. v. New York*, 801 N.E.2d 326, 328 (N.Y. 2003); *Vincent v. Voight*, 614 N.W.2d 388, 413 (Wis. 2000).  Plaintiffs do not cite to, and this court is unaware of, any provision in either federal or local law elevating education to a fundamental level in the District.

### 4. *Count Four*

In Count Four, plaintiffs allege that the District's public schools are segregated along racial lines in violation of the Fifth Amendment. *See* Am. Compl. ¶ 90 ("[S]tudents at most DC public schools, including those represented by Plaintiffs herein, are mostly low income African Americans."). Plaintiffs argue that "[i]f the ruling in *Brown v. Board of Education* means anything, then there is a daily violation of the equality principle occurring in most public schools." *Id.* ¶ 91.

Plaintiffs do not allege that the asserted segregation in the District's public school system is "specifically mandated by law or by public policy pursued under color of law." *Hobson v. Hansen*, 269 F. Supp. 401, 493 (D.D.C. 1967) (Skelly Wright, J.) (defining *de jure* segregation). Rather, plaintiffs' complaint makes clear that the alleged segregation in the District is *de facto*, or "occurs without state authority, usually but not always on the basis of socioeconomic factors." *Graham v. Evangeline Parish Sch. Bd.*, 223 F.R.D. 407, 411 (W.D. La. 2004). Moreover, plaintiffs never suggest that any current racial imbalance in the District's schools is traceable to the District's prior *de jure* segregation. *See, e.g.*, *Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors."); *Swann v. Charlotte-Mecklenberg Bd. of Educ.*, 402 U.S. 1, 31–32 (1971).

In *Keyes v. Sch. Dist. No. 1*, 413 U.S. 189 (1973), the Supreme Court addressed the issue of what needs to be alleged and proven to establish that *de facto* segregation violates equal protection principles. *Keyes* held that, absent laws requiring school segregation, a plaintiff must prove "intentionally segregative school board actions in a meaningful portion of a school system."

*Id.* at 208.  As such, *de facto* segregation "constitutes a constitutional violation only if there is proof of discriminatory purpose."  Erwin Chemerinsky, Constitutional Law: Principles and Policies § 9.3, at 699 (2d. ed. 2002).

As with the equal protection claim in Count Two, the allegations in plaintiffs' amended complaint—which the court must assume to be true—contradict any suggestion that defendants acted with discriminatory purpose.  Rather than accusing defendants of committing intentionally segregative action, plaintiffs allege that the segregation that exists today in the District's schools is the result of "pervasive mismanagement, lack of accountability and poor governance of DCPS" that has driven "most middle and upper income families, both white and African American, out of the public schools."  Am. Compl. ¶ 90.  Such allegations suggest negligence at most and negate any inference that defendants acted with a discriminatory purpose with regard to the entire school system.  Consequently, the court dismisses Count Four of plaintiffs' amended complaint.[30]

### 5.  *Count Five*

Count Five of plaintiffs' amended complaint attacks the "complete lack of accountability," Am. Compl. ¶ 95, "the overall ineptness," *id.* ¶ 97, and the "gross mismanagement," *id.* ¶ 98, of the District's public school system, and alleges that the "failure of Defendants to provide an adequate process to allow serious issues of law and policy to be addressed by concerned parents and teachers is a denial of due process."  *Id.* ¶¶ 98 & 99.  Essentially, plaintiffs are unhappy with

---

[30]  The court's conclusion with regard to Count One—that it can reasonably be inferred that defendants had a discriminatory purpose when they supported Two Rivers—is not at odds with this conclusion.  As the Court in *Keyes* made clear, to establish impermissible *de facto* segregation of an entire school system, plaintiffs must allege and prove that the government action affected "a meaningful portion of [that] school system."  413 U.S. at 208.  Allegations of discriminatory purpose with regard to one charter school are insufficient to meet this standard.

the administration of the public school system and wish that defendants were more responsive to their complaints.

As with Count Two, plaintiffs fail to allege what property, liberty, or life interest has been deprived by defendants' asserted failure to "have an accountable process for participants in public schools to raise serious issues," *id.* ¶ 98. And unlike Count Two, there does not appear to be any basis in state law to suggest that plaintiffs have any protected interest in having their disputes with the management of the District's public schools handled in any particular fashion. While plaintiffs certainly have "an abstract desire" to have defendants respond to their complaints, plaintiffs fail to allege why they are legitimately entitled to such. *Roth*, 408 U.S. at 577; *Doe by Fein*, 93 F.3d at 868.[31] Because of this failure, dismissal of the constitutional claim in Count Five of plaintiffs' amended complaint is appropriate.

Moreover, the Supreme Court has made clear that federal courts should be hesitant to interfere with school management issues. *See Goss*, 419 U.S. at 578 ("Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. By and large, public education in our Nation is committed to the control of state and local authorities."). Relying on this language, the Tenth Circuit has observed:

> [A]lthough education is a not a 'fundamental right' in the United States, good parents nonetheless have fundamental aspirations about the education of their children. Hence it is not surprising that these convictions should produce conflicts that run equally deep. Yet all disagreements cannot be resolved by the federal courts, especially when they relate to local education policies upon which both warring factions hold deep and sincere beliefs. This question is political, not legal.

---

[31] In their opposition, plaintiffs cite *Goss v. Lopez*, 419 U.S. 565, 574 (1975), for the proposition that they have a property interest in the continued receipts of an education, but fail to explain why this includes the right to have the public school system managed to their liking.

*Villenueva v. Carere*, 85 F.3d 481, 488–89 (10th Cir. 1996).  Plaintiffs' displeasure with the management of the District's schools and the policy decisions of the various schools officials must be dealt with in the political realm.

### III.  CONCLUSION

_____In sum, the court today dismisses many of the claims in plaintiffs' amended complaint. The sole claim that survives defendants' motions is plaintiffs' claim that governmental support of Two Rivers violates the equal protection principles embodied in the Fifth Amendment.  The court notes that this claim only survives to the extent that it is pressed against Two Rivers, the D.C. Council, and the individual defendants in their official capacities.

Accordingly, it is this 3rd day of July 2006, hereby

**ORDERED** that the Council defendants' motion to dismiss [#21] is granted in part and denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that the District defendants' motion to dismiss [#23] is granted in part and denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that Spellings's motion to dismiss [#24] is **GRANTED**; and it is further

**ORDERED** that Two Rivers' motion to dismiss [#25] is granted in part and denied in part as set forth in this Memorandum Opinion; and it is further

**ORDERED** that all claims in plaintiffs' amended complaint against defendant Spellings, DCPS, the D.C. Board of Education, the D.C. Public Charter School Board, and, in their personal capacities, Sharon Ambrose, Kevin Chavous, Tommy Wells, Peggy Cooper-Cafritz, Robin Martin, Laura Gardner, Mirian Saez, Carrie Thornhill, Julie Mikuta, Dwight Singleton, Mayor Anthony Williams, and Dr. Robert C. Rice are dismissed; and it is further

**ORDERED** that the claims challenging the admissions process at Two Rivers are

**DISMISSED**; and it is further

**ORDERED** that the due process and Human Rights Act claims in Count One of plaintiffs'

amended complaint are **DISMISSED**; and it is further

**ORDERED** that Counts Two, Three, Four, and Five of plaintiffs' amended complaint are

**DISMISSED** in their entirety._____

Henry H. Kennedy, Jr.
United States District Judge