IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Save Our Schools-Southeast and Northeast, *et al.* [628 North Carolina Ave. SE, Washington, DC 20003]<br><br>     Plaintiffs,<br><br>v.<br><br>District of Columbia  Board of Education Members in their Official Capacity:  Tommy Wells, Peggy Cooper-Cafritz, Robin Martin, Laura Gardner, Mirian Saez, Carrie Thornhill, Julie Mikuta, and Dwight Singleton [1350 Pennsylvania Ave. NW Washington, DC 20004]<br><br>Council of the District of Columbia, and the following Members in their Official Capacity: Sharon Ambrose and Kevin Chavous [1350 Pennsylvania Ave. NW Washington, DC 20004]<br><br>District of Colombia Mayor Anthony A. Williams [1350 Pennsylvania Ave. NW Washington, DC 20004]<br><br>Dr. Robert C. Rice, Former Acting Superintendent of District of Colombia Public Schools in his Official Capacity [825 North Capitol Street, NE 9th Floor Washington, D.C. 20002]<br><br>District of Columbia Public Charter School Individual Board Member Josephine Baker and Member Tamara Lumpkin in their Official Capacities [1436 U Street, NW, Suite 401, Washington, DC 20009]<br><br>Two Rivers Charter School [622 6th Street NE Washington, DC 20002]<br><br>     Defendants. | Case No.: 1:04CV01500<br>Judge: Henry H. Kennedy<br><br><br><br>**REVISED SECOND AMENDED COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES JURY TRIAL DEMANDED** |

**Introduction and Background**

1. The public school system in Washington, DC ("DC") is notoriously dysfunctional. This point was conclusively demonstrated by the recent disastrous performance by DC schools on standardized tests mandated by the so-called No Child Left Behind Act ("NCLB"). This is attributable to a number of factors, but is primarily the result of mismanagement, entrenched bureaucracies, incompetent leadership, and, perhaps most significant, overlapping and unclear lines of authority between the various public servants charged with the future of DC's children, which creates and reinforces a culture of unaccountable officials.  These problems have caused a massive flight from the public schools by families taking advantage of the numerous options to opt out of the public schools, including private schools, assisted by the recent imposition of a voucher program by Congress, the "charter school" movement, and flight to the suburbs. Indeed, DC went through a fiasco recently in its effort to hire an experienced, highly competent Superintendent. The top candidates declined the position precisely because the system is structured to fail.

2. The problems of DC public schools are more pronounced than those in other major cities in the United States because of DC's unique status as a governmental entity that is not a state, and although a city, lacks the authority to raise school funds through an independent taxing power. The ultimate power of Congress to intervene in the internal affairs and governance of the school system through its power of appropriation has had a negative impact on developing strong and independent local leadership for the schools. For example, the charter school legislation was bitterly contested in 1995, when it was part of a combined bill in Congress that also included vouchers. To end a filibuster, the voucher part of the bill was eliminated. Charters were taken as

2

a compromise to prevent vouchers. Advocates in Congress for privatizing education in DC did not relent, however, and in 2003 an earmarked appropriation for voucher schools was passed, the DC School Choice Incentive Act of 2003, PL 108-199. Members of Congress who could never pass such legislation in their home states have succeeded in forcing the mostly African American and low income children of DC public schools to be the guinea pigs in an experiment to essentially privatize public education. The latest national results confirm that charter schools performed significantly lower than public schools on standardized tests for purposes of NCLB, highlighting that the national experiment with DC's children is causing profound harm, and is merely a temporary stop gap measure that still leaves public schools without a plan for major structural improvement to benefit all children under the care of DC's public entities.

   3. The predictable result of the failed public school system in DC is that children who need quality public education the most, low income children lacking options, are victimized on a daily basis by poor facilities, reduced budgets, lack of community support, inaction and paralysis of the DC school system, and the indifference of most of those in the community who have the ability to opt out of the system. The slogan of the day, "No Child Left Behind," is a cynical and cruel irony in DC, where, in reality, the most descriptive slogan for the public schools is "The Children Who Are Behind Are the Only Ones Left." As a result, DC has one the poorest records in the country when it comes to performance of schools, test scores, or any other objective measure. This is a failure of leadership that approaches criminal negligence. Public officials in DC, the capitol of the richest country on earth in the history of the world, refuse to accept responsibility for educating its young citizens and keeping them safe.

4. The most recent assault on the DC public schools is the aggressive promotion of charter schools by the officials charged with running the DC public school system. Formalizing this approach, Defendant Mayor Anthony A. Williams and Senator Mary L. Landrieu announced on August 18, 2004 a new program to provide $5 million in fiscal year 2004 to build new charter schools. The program, "City Build," has no funds to build new public school facilities or improve the existing, crumbling, public schools, and is devoted solely to providing further incentives to DC residents to abandon the existing public schools. This self-defeating strategy assumes the incompetence of the administrators and public school officials in DC, something Plaintiffs herein do not dispute, but, rather than embark on a program to improve the public schools, the promotion of charter schools is the surrender of a sacred public function to provide education.  In various laws and policies, DC officials are charged with working to improve funding for DC public schools and to improve the quality of education provided in the public schools. Yet, despite this professed priority, the DC public school officials are slashing public school budgets, even in schools that are improving and meeting performance standards, such as Wilson High School, while aggressively  implementing and funding a charter school program designed to or having the effect of starving and condemning the public schools. The reality of the DC public schools is a shocking testament to the willful dereliction of duty by irresponsible public officials.

5. The current laws applicable in DC provide a funding advantage that allows charter schools to offer benefits to students and parents that so far exceed what is available in comparable public schools as to be a blatant plan to eradicate public schools. For example, as a result of the School Reform Act of 1995, charter schools get a higher per pupil expenditure allotment than do public schools. Further, despite this initial financial advantage, charter schools

4

are not required to contribute any portion of their funding based on the applicable per pupil formula back to the DC Public School System ("DCPS") for Central Administration or Instructional Support, which amounts to roughly 11% of the budgets for public schools. Forcing public schools to contribute a substantial portion of their budget for "services" of DCPS, which is pursuing an aggressive strategy to favor or promote charter schools at the expense of public schools, goes to the heart of the extreme mismanagement of DCPS.

6. In addition, charter schools often get an additional windfall because they get a per pupil allocation for facilities, but when DCPS also provides a charter school with a public building, they provide it at below market rates. School funding rules allow the charter schools to keep the difference for general expenditures. Further, charter schools collect their per pupil formula based on projected enrollment as of the July 1 prior to  the start of the school year, and are not required to refund any portion of these funds if the projected enrollment is too high or if a student drops out or transfers to a public school. The payments are adjusted based on actual enrollment only in the fourth quarter of the school year. Public schools do not have either of these budgetary advantages. Additionally, charter schools can receive DC-guaranteed revenue bonds to fund new facilities as well as renovations. This source of funding is not available to public schools. Finally, "City Build" and other programs provide public funds from public officials to charter schools, but not public schools, in order to make them more attractive and to provide better facilities at public expense for families that have opted out of the public schools.

7. The officials with responsibility for governing the DC public schools have themselves opted out of the system for the education of their own children. The public officials with the most direct culpability in allowing the DC public schools to fail are personally indifferent to the plight

of students in the public schools because their children are not subjected to the disruption and lost opportunity of this damaged system, or in the case of Defendant Tommy Wells, have no children, and therefore no personal stake in the success of the system. For example, Defendant Kevin Chavous, the now former Ward 7 representative on the City Council and Chair of the Education Committee during the time most of the policies favoring charter schools over public schools were implemented, has his children in a private school in DC. Defendant Peggy Cooper-Cafritz, the President of the DC Board of Education, likewise has her children in a private school. Defendant Sharon Ambrose, the Ward 6 representative on the City Council, and a key operative in many of the unlawful acts described herein, rather than working to improve the public schools for all of the city's children, opted out of the public schools for her child. She has told her Ward 6 constituents in various ways that DCPS is hopeless, and in doing nothing to address the problems she knows to exist, she condemns the children remaining in the DC public schools to an inferior education. Former council member Harold Brazil, who consistently voted against expanding the budget for DC public schools and was recently voted out of office, has his children in the private Capital Hill Day School.

8. The result in DC is that the "school choice" movement, with its primary emphasis on charter schools, is creating a two-track system: well-funded charter schools with new resources for buildings and other facilities, and then the public schools, which the public official Defendants herein view clearly as the holding pen for low income, mostly African American, students, who these same officials ultimately would like to drive out of the city with their plans for converting public housing projects to high-priced new housing developments, or to sentence them to a lifetime of second class citizenship due to an inadequate education from public schools

that have been systematically starved of resources. In DC, "school choice" is the modern equivalent of "separate but equal," except to revert to a segregated and wholly inadequate school system in 2004 is all the more criminal 50 years after the promise of *Brown v. Board of Education*. The objective reality is that public school students in DC are essentially before this Court seeking to prevent unlawful polices and practices that have left them on the unequal side of a dual educational system that is "separate and unequal".

9. The problems of the DC public schools are serious, but not intractable. They could be solved with a focused commitment by the public official Defendants herein to first respect the specific requirement of § 38-916 of the DC Code that "funding of the **public** schools be acknowledged as of the highest priority of the District of Columbia." With adequate resources, a process could begin to repair and build a decent public school system for all of DC's children, not just those who are willing to abandon the most needy students for the lure of new funding for charter schools.

10. The DC school district is governed by overlapping entities that often have conflicting agendas and objectives to the detriment of the children attending DC public schools. This has been an ongoing problem as even the U.S. Congress has a major role in setting DC school policy. Congress has the power to appropriate funds for the DC Schools and to earmark those funds for specific programs, regardless of whether those programs are consistent with the long term viability of the DC public schools or the best interests of DC's public school children. Key examples of this are the voucher program, which was foisted upon the DC Schools by Congress, and the legislation to facilitate and fund the creation of charter schools, the District of Columbia School Reform Act of 1995. The other entities responsible for the malfunction of the DC

7

schools, and in failing to cooperate in setting a rational policy, are identified below. Indeed, something that could only happen in DC, the DC Board of Education and DC Charter School Board have overlapping jurisdiction to issue charters to charter schools applying different standards.

11. The result of the extremely poor governance structure of the DC public schools, as is illustrated by the allegations below,  is that the system leaves no entity or individual with responsibility or accountability. The governance of DC public schools is a multi-headed hydra of power centers that reverts to a retracted turtle when it comes to accountability and responsibility. With any major problem, rather than having strong leadership directed to solving it, each entity or individual with some jurisdiction over the problem abdicates responsibility safe in the knowledge that some other entity or individual can be blamed. This has fostered a culture of irresponsibility, and has so demoralized the public school community that few bother to make demands upon the system.

12. The lack of a functioning system to address the frequent violations of law and policy occurring regularly in the DC public school system is itself a violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States and also results in a denial of Equal Protection for the students stuck in the DC public schools.  The decline in education programs and standards is only getting worse.

13. As a result of NCLB, the consistently poor and unimproved test scores for most of the DCPS requires that students attending an "underperforming" school be permitted to transfer to a school that meets the test standards. As a result of the 2003-04 test scores, officials of DCPS have conceded that, for the most part, there is no space available for students to transfer into

"performing" schools. Consequently, NCLB requires that funds be available for tutoring those students unable to be offered a transfer slot. This mandated but unfunded  requirement will further erode the budget available to provide quality education for all students in DCPS.   Indeed, NCLB's only immediate impact in DC is that Title I funds previously available for education programs must now be re-programmed for mandated tutoring for students in failing schools, the results of which are highly dubious as private for-profit firms are providing packaged tutoring programs that are not tailored to the issues facing inner city school children.

14. An additional unfair benefit bestowed upon charter schools over public schools is that as a matter of law and practice, charter schools are exempt from many costly rules and regulations applicable to public schools. The millstone of the DCPS bureaucracy is legally binding on public schools, which also must pay for the "services" of DCPS, while charter schools are free of both obligations.

15. The individual Plaintiffs herein are all parents or guardians of students in the DC public schools who have suffered injuries due to the extreme abdication of responsibility for the governance of the DC public schools, and the policies of surrender created and implemented by the Defendants. DCPS's shortsighted strategy is to encourage those who can to opt out of the system, leaving fewer resources for the remaining students in public schools, and subjecting them to various injuries. Meanwhile, the students in charter schools are given priority for access to resources and facilities, and are offered programs, such as non-essential day care and language classes, that the resource-starved public schools could only dream of offering to their students, but which should be standard fare in any developed country, let alone the richest country ever.

16. Defendants described herein are the entities and individuals with responsibility for

9

governance of the DC public schools and who have completely abdicated their duties and responsibilities, as demonstrated conclusively by the reality of public schools in DC.

<b><u>Jurisdiction and Venue</u></b>

17.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, based on federal question claims based on the Fifth Amendment to the Constitution of the United States, and 42 U.S.C. §§ 1981 and 1983. Supplemental jurisdiction exists over the claims based on the DC Human Rights Law pursuant to 28 U.S.C. § 1367.

18.  Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391 b & c.

<b><i><u>Plaintiffs and Their Injuries.</u></i></b>

19. Plaintiff Save Our Schools – Southeast and Northeast (hereinafter "SOS-SE/NE") is a community-based nonprofit association whose members are either parents of children in public schools or public school supporters who agree that the future of DC depends almost entirely on rescuing the public schools from defeatism and failure. SOS-SE/NE has members drawn from most of the public schools in the SE and NE quadrants of DC who are banding together to work to restore the future of DC's public schools as the highest priority of the various public officials named as Defendants herein.

20. Members of SOS-SE/NE have children in public schools who have suffered injuries from all of the specific causes of action alleged herein, including Eliot Junior High and Sousa Middle School, public schools that have suffered particularly egregious unequal treatment described below, and, rather than seek relief as individuals, these parents have banded together as a community to seek broader relief, not just for their own children, but for all of the children in the public school community. SOS-SE/NE has expended financial resources, as well as a

10

substantial amount of the time of its members, to address the issues that are the subject of this Complaint.  The failure of Defendants to even attempt to make progress on public schools issues at the start of the 2004-05 school year results in an ongoing injury attributable to Defendants' unlawful acts.

21. Plaintiff Ardina Edwards is the mother of Amanda Carter, who is currently a fifth grader at Stuart Hobson Middle School in NE Washington. Stuart Hobson has suffered severe budget cuts for the 2004-05 school year because it has the burden, like other public schools, of having its total funds based on the per pupil formula reduced by 11% to pay for DCPS central administration and services. Charter schools do not have to pay for these services, even though the DC public schools do provide them services, buildings and other benefits. The students at Stuart Hobson are suffering from a declining program, while they are also being forced to subsidize the services provided to Charter schools free of charge by DC public schools. Making matters worse, Stuart Hobson was identified as a failing school by the NCLB process. Entering fifth graders received a cynical and empty notice from DCPS that they had the right to transfer to Hardy Junior High under the NCLB regulations. However, Hardy does not have a fifth grade, nor does it have spaces in the later grades for significant transfers from Stuart Hobson.

22. Plaintiff Wendy Glenn is the parent of Kristofer Glenn, and Plaintiffs Rhonda Travers and William Davis are the parents of Ashley Travers. Both minor children are students at Eliot Junior High School in NE Washington. Eliot's students are 100% African American. As a public school, Eliot has had its budget slashed for the 2004-05 school year, and in recent years has had to cut basic programs in music, art, and technical instruction. Further, parents of students at Eliot are not able to secure non-essential day care for their preschool children, and the school does not

11

offer any language courses. In sharp contrast, Two Rivers charter school, which was given space at the Eliot building at a very favorable and below market rate for the 2004-05 school year, is able to offer language courses, full time teacher aids in every classroom, art and music classes, and nonessential day care to its largely white, relatively affluent, students due to the inequities of funding in DC that give more resources to charter schools than public schools. Further, as a prime example of the unlawful favoritism shown to Two Rivers by public officials dispersing public funds, the school was awarded a one million dollar "City Build" grant, for which only charter schools are eligible, even though Two Rivers is not within any designated "emerging neighborhood" as required by the program. To ensure that all students in the Eliot building are clear about their respective places, the Two Rivers school established a separate entrance for its more privileged, relatively affluent and largely white students.

23. Plaintiff Absalom Jordan is the father of J. Ronald Jordan, a student at Simon Elementary in SE Washington. The student population at Simon is 100% African American, with 85% of the students considered low income and eligible for the free or reduced lunch program. The students at Simon are deprived of the opportunity to attend a diverse school, and are instead attending a segregated school, because the policies of the Defendants, described more fully below,  actively encourage middle and upper income families to opt out of the public school system and attend either private or charter schools. Also, the students at this school are deprived of the numerous program and funding benefits provided with public funds to the students at Defendant Two Rivers, as described in ¶ 22, *supra*.

24. Plaintiff Darlene Williams is the legal guardian of Rodney and Tyshida Williams, both students at Sousa Middle School in SE Washington. Significant amounts of hazardous

12

asbestos have been discovered in the walls and ceilings at Sousa. The parents and teachers have approached the dysfunctional governance structure of the DC public schools and have demanded that the students, faculty and staff be moved to another location during the asbestos removal for their safety, and to minimize the disruption by allowing the work to proceed much faster without the presence of people. Due to the conflicting powers and dysfunctional governance structure of the DC public schools, as described below, there is no clear process to allow Plaintiff Williams and the other impacted parents, faculty and staff, to petition the DC public schools for appropriate relief. Also, the students at this school are deprived of the numerous program and funding benefits provided with public funds to the students at Defendant Two Rivers, as described in ¶ 22, *supra*.

25. The parents, faculty and staff, with the support of DC Board of Education member William Lockridge, made a proposal to use space at Eliot Junior High School, which has excess capacity. This request was denied. Rather, the excess space was provided to Two Rivers charter school, which, as described below, is a school that was founded specifically with the objective of not having a school that was "too black." The Sousa parents attempted to raise the issue of swing space with school officials, who denied Sousa parents and faculty the right to speak at the July 21, 2004  DC School Board meeting, where the decision was made to give the space at Eliot to the Two Rivers Charter school, without first allowing representatives from Sousa to raise the emergency of the exposure of the faculty, staff and students to asbestos.

26. Speaking for the parents, faculty and staff at Sousa, Mr. Lockridge also made a proposal to use space at the building formerly used as Evans Middle School, which has excess capacity because the school was closed on June 24, 2004.  During the 2003-04 school year,

13

Evans had over 250 students, who will now attend Kelly Miller Middle School. The Evans building is now occupied by the Luke C. Moore Academy (a DCPS "second chance" school for returning drop-outs) and a satellite campus of Maya Angelou charter school, which has approximately 63 students. This request to use Evans as swing space for Sousa was refused because the space was provided to Maya Angelou Charter school. The result is that the Defendant public officials and entities were willing to expose the students, faculty and staff at Sousa to hazardous asbestos because the Defendants favor charter schools over public schools. Indeed, at a meeting of citizen activists held on August 14, 2004, an official of the DC Department of Public Health confirmed that the Sousa occupants would face serious health hazards due to asbestos removal, and that the DCPS health officials had assured the DC Department of Public Health that there would be no occupants in the building during the asbestos removal. Based on severe public reaction, DCPS has at least announced that they will delay the removal, leaving the students, faculty and staff exposed to asbestos, and attending a public school building that is rapidly deteriorating, while nearby public school buildings are being refurbished for charter schools to occupy.

27. Plaintiff Gail Sonnemann  is the parent and legal guardian for Julie Clare Brylawski, a student at Wilson High School in NW Washington. Wilson has suffered severe budget cuts for the 2004-05 school year because it has the burden, like other public schools, of paying approximately 11% of its budget back to the DC public schools to pay for central administration and services. Charter schools do not have to pay for these services, even though the DC public schools do provide them services, buildings and other benefits. The students at Wilson are suffering from a declining program, while they are also being forced to subsidize the services

provided to charter schools free of charge by DC public schools. Indeed, Wilson is the flagship school of the DC system, and has relatively high performance indicators. Despite its success as a school, DCPS still slashed its budget. Also, the students at this school are deprived of the numerous program and funding benefits provided with public funds to the students at Defendant Two Rivers, as described in ¶ 22, *supra*.

## Defendants[1]

28. Defendant District of Columbia  Board of Education (DC Board of Education) has abdicated its statutory duty to provide quality education to the children of DC who attend public schools. The DC Board of Education sets the day-to-day policies for DC public schools, shares the authority to issue charters to charter schools with the District of Columbia Public Charter School Board ("DC Charter School Board"), approves budgets and allocates resources to the public schools. Members of the DC Board of Education have also been actively involved in assisting and providing resources to charter schools.

29. As is described more fully below, Defendant Tommy Wells is a member of the DC Board of Education from Wards 5 and 6. Defendant Wells is a former political activist who does not have any children, and has no personal stake in the quality of public education in DC. Defendant Wells has been active in closing public schools to allow the buildings to be used for

---

[1]Pursuant to the Court's July 3, 2006 Memorandum Opinion and Order on Defendants' Motion to Dismiss (July 3rd Order), Defendants Margaret Spelling, the U.S. Department of Education, the District of Columbia School Board, and the District of Columbia Charter School Board are no longer parties to this lawsuit. Pursuant to the Court's July 3rd Order, the case is also proceeding against all individually named government officials solely in their official capacities. Finally, the DC Charter School Board has been substituted herein with Defendants Josephine Baker and Tamara Lumpkin, respectively the Executive Director and Deputy Director of the DC Charter School Board.

charter schools, or to be sold to developers for non-education-related uses, such as health clubs and high-end housing.

30. Defendant Wells is named as a defendant in his individual capacity because, based on DC Code §38-104, he is immune from personal liability only if he acts in "good faith."  With respect to his advocacy for and his vote to provide the Two Rivers Charter school with public resources and a public facility first at Van Ness Elementary, and when that effort was blocked by community efforts due to blatant failures by Defendants Wells and Rice to follow the public hearing requirements of DC law, at Eliot Junior High School. As described more fully below, Defendant Wells did not proceed in good faith. He had specific knowledge that the founders of Two Rivers School had indicated they did not want to attend neighborhood public schools that were "too black." At the time Defendant Wells was trying to close down Van Ness to provide that building to Two Rivers Charter school, he knew that he and DCPS had failed to follow the requirements of DC law regarding a public hearing and notice period as a legal prerequisite to closing a public facility.

31. Further, at the time Defendant Wells voted to support Two Rivers School with space at Eliot, he was also aware that Two Rivers had achieved its objective of creating a school that was not "too black." The enrollment figures that Defendant Wells was presented with for Two Rivers indicated that the initial student body has  45% white students, 40% African American, 10% Latino, and 5% Asian. Defendant Wells was specifically informed by public school activists and supporters that, in a school district with a student population that is 84.4% African American and 4.6% white, it would be a miracle of chance to have more white students than African Americans. The only reasonable conclusion was that the Two Rivers' objective was reached –

16

they manipulated the enrollment rules to create a school that was not "too black" for them, and Defendant Wells knew this when he voted to provide public facilities to Two Rivers charter school.

32. The other DC Board of Education Defendants are the members of the DC Board of Education who voted to provide public resources and a public building to Two Rivers: President Peggy Cooper-Cafritz, Robin Martin, Laura Gardner, Mirian Saez, Carrie Thornhill, Julie Mikuta, and Dwight Singleton (with DC Board of Education and Defendant Wells collectively referred to as "School Board Defendants"). These individual Defendants were all provided specific notice that Two Rivers had a stated objective of creating a school that was not "too black, " and that the initial enrollment figures for Two Rivers indicated that the initial student body has  45% white students, 40% African American, 10% Latino, and 5% Asian. All of these members of the DC School Board were specifically informed by public school activists and supporters that in a school district with a student population that is 84.4% African American and 4.6% white, it would be a miracle of chance to have more white students than African Americans. The only reasonable conclusion was that the Two Rivers' objective was reached – they manipulated the enrollment rules to create a school that was not "too black" for them. Each of the named members of the DC School Board knew this when they voted to provide public facilities to Two Rivers charter school.  The sole dissent was from member William Lockridge. Given this specific knowledge at the time they voted to provide public resources to Defendant Two Rivers, based on DC Code §38-104, these Defendants did not act in "good faith" and are named as Defendants in their personal capacities as well as their official capacities.

33. In addition, Defendant Wells, as well as Defendants Cooper-Cafritz, Martin, Gardner,

Saez, Thornhill, Mikuta, and Singleton were specifically informed that the students, faculty and staff of Sousa would suffer significant health risks if exposed to hazardous asbestos removal. However, in refusing to agree at the DC Board of Education meeting on July 21, 2004 to provide swing space for Sousa at either Evans or Eliot, these Defendants were intentionally acting to favor charter schools by giving them the space at these public school buildings, rather than to provide the space to Sousa. Based on DC Code §38-104, these Defendants did not act in "good faith" in voting to expose the community at Sousa to dangerous asbestos removal, and leaving the Sousa community in an unsafe building.

34. Defendant Council of the District of Columbia  ("DC Council")(with the individually-named Council Defendants collectively referred to as "DC Council Defendants") has the power to appropriate funds for specific programs for the DC schools, to require public facilities and other resources to be made available to charter schools at the expense of public schools, and to require school planning to conform to development objectives of the DC Council. In fact, the DC Council has a statutory obligation under the DC School Reform Act of 1995 to provide "uniform funding" for public and charter schools, which the DC Council, along with Defendant Mayor Williams, has failed to implement. Instead, the DC Council recently has directed the DC Board of Education to use the excess capacity of school buildings in the DC public schools to provide space for charter schools. Further, members of the DC Council have also been actively involved in assisting and providing resources to charter schools. In addition, DC Council recently voted to shift funds appropriated for public school pre-k programs to further fund pre-school programs for three-year olds in charter schools, a program public schools are prohibited from offering.

35. Defendant Sharon Ambrose is a member of the DC Council from Ward 6. She has

18

worked directly with Defendant Tommy Wells to pursue a development strategy that drives low income African American students attending public schools out of the public schools in Ward 6 in order to make room for high-end development, and middle and upper income families, to move to Ward 6. She was involved in supporting and assisting the effort to provide the Two Rivers charter school with public resources and a public facility first at Buchanan School, which was owned by a private person, Walter Boek, who had been trying for years to get the International Graduate University, owned by Dr. Boek,  licensed in DC. Defendant Ambrose, in conjunction with Defendant Wells, offered to use her authority on the DC Council to solve Dr. Boek's licensing problems if he provided space in the Buchanan school building for Two Rivers school. Boek refused, and properly called this offer a solicitation of a bribe.

36. Defendant Ambrose, along with Defendant Wells, then decided to close down Van Ness Elementary to give that public building to Two Rivers, and when that effort was blocked due to illegal actions in the process of closure, they turned their attention to getting Two Rivers space at Eliot Junior High School.  At the time Defendant Ambrose provided assistance, advice and encouragement to Two Rivers school, she was aware that the school had been promoting itself as one that would have no single race in the majority. When questioned by public school advocates about her support for Two Rivers, Defendant Ambrose said that she saw nothing wrong with trying to create schools that were "more diverse". She had no response to a question regarding how that could be achieved given that the DC public school population is 84.4% African American and 4.6% white. Her office refused to respond to questions from constituents about how she justified her position on providing public support to Two Rivers.

37. While all of the members of the DC Council share culpability for the failure of DC

public schools, and the sacrifice of DC's neediest children to indifference, Defendant Kevin

Chavous, a former member of the DC Council, played a special role in this parade of errors and

omissions. Defendant Chavous was Chair of the DC Council's Committee on Education,

Libraries and Recreation during the time most of the decisions to favor charter schools were

made and implemented. He was recently voted out of office, no doubt due in part to his policies

that left DC public school students under his charge with inferior education programs. During the

time he was responsible for DC public schools in the Council, Chavous was an advocate for

privatizing public schools. Indeed, he wrote a book, *Serving Our Children: Charter Schools and

the Reform of American Public Education* (2004). Not willing to subject his own child to the DC

public schools, or even to his pet project of charter schools, Defendant Chavous enrolled his son

in a private school shortly after he was elected to the DC Council.

38. The DC Charter School Board was created to have the authority to issue charters to

charter schools. It shares this authority with the DC Board of Education, but there is essentially

no coordination or shared standards in making decisions regarding issuance of a specific charter.

The DC Charter School Board has one primary function: to issue charters. It was created by

Congress in 1996 with the sole purpose of increasing the number of charter schools in DC. Once

a charter has been approved, DC Charter School Board takes no further responsibility for

assisting the new school in finding and securing space, implementing curriculum, or

administering its budget.

39. Defendants Josephine Baker and Tamara Lumpkin, the Executive Director and

Deputy Director of the DC Charter School Board, issued a charter to Defendant Two Rivers

when its admissions procedures were not in conformity with the DC School Reform Act.  When

presented with concrete information, originating from Two Rivers charter school, that its

entering class would be 45% white, 40% African American, 10% Latino, and 5% Asian,

Defendants Baker and Lumkin refused to conduct a public hearing to review whether the

admissions process was in violation of the law, and it refused to revoke the charter for Two

Rivers despite the fact that the DC school system is 84.4% African American and 4.6% white.

40. Defendant Robert C. Rice was the Acting Superintendent of the DCPS until August

15, 2004. He was  appointed by the DC Board of Education, but was responsible to all of the

entities that have authority over some aspect of education in the District of Columbia. The

overlapping powers of these bodies, and the conflicting demands placed upon the

Superintendent, for example with respect to allocation of resources for public vs. charter schools,

leaves the Superintendent unable to prioritize or to make decisions for the good of the public

schools. Indeed, this is the main reason why DC had serious problems in its effort to hire and

retain a highly qualified, experienced Superintendent.

41. Defendant Rice has failed utterly to take action to protect and support students in the

DCPS by actively favoring students in charter schools over those in public schools. He supported

each of the specific wrongful acts described herein.  For example, Defendant Rice was a key

advocate for providing Defendant Two Rivers with a public school building even though he had

specific notice of the discriminatory admissions practices previously described herein. Further, he

was specifically informed that the students, faculty and staff of Sousa would suffer significant

health risks if exposed to hazardous asbestos removal. However, in refusing to agree at the DC

Board of Education meeting on July 21, 2004 to provide swing space for Sousa at either Evans or

Eliot, he was intentionally acting to favor charter schools by giving them the space at these public

school buildings, rather than to provide the space to Sousa. Although Defendant Rice is no longer the acting Superintendent, DCPS remains responsible and liable for his acts even after his departure.

42. DCPS (collectively with Defendant Rice referred to as the "DCPS Defendants") is the corporate entity that is responsible for the day-to-day management of the schools. DCPS allows its staff, managers and other employees to provide direct services to charter schools, at the expense of public schools. Moreover, DCPS is so badly organized and managed that students with cognizable claims of injury are denied basic due process and equal protection. It is common knowledge that DCPS serves more as a source of patronage employment than education services.

43. Defendant Mayor Anthony Williams does not have a direct role in school governance, but he has a statutory  responsibility under § 38-916 of the DC Code to advocate for the budget for DC public schools. In addition, the Mayor, along with the DC Council, has a statutory obligation under the DC School Reform Act of 1995 to provide "uniform funding" for public and charter schools, which the Mayor and DC Council have failed to implement. Indeed, the Defendant Mayor announced on August 18, 2004 a new program exclusively for charter schools, "City Build," which will provide federal funds, obtained by Defendant Mayor through his direct efforts, to provide $5 million a year to build new charter schools. The Mayor has  failed to act to provide at least equal treatment for public school students compared with charter school students. Defendant Williams also has the right to appoint 4 members to the DC Board of Education. His appointments have largely been of a political nature, and he has not used his power of appointment to provide experienced, effective leadership on the DC Board of Education, or of people who at least have children in the DCPS, and who therefore might have a direct stake in

working to improve the schools. Finally, as described in ¶ 22, *supra*, Defendant Williams has

used the power of his office to create and fund the "City Build" program, which provides major

grants to charter schools, but not public schools, and which is a major source of the public funds

used to perpetuate a newly segregated public school system in DC.

44. Defendant Two Rivers charter school is a charter school within DC. It was granted a

charter in December 2003, and plans to open in September 2004 in space at Elliot Jr. High

School. The founders of Two Rivers specifically set out to create a school that was not "too

black." Rather than attend private schools or move to suburbs with a racial mix more to their

liking, the founders of Two Rivers sought to obtain public funds to establish an illegal school

that used a discriminatory admissions process to ensure that their school was not "too black."

The founders initially advertised on the school website, www.tworiverspcs.org, that in order to

achieve "diversity," no single race would be in the majority. When pressured to release the

demographic information on their entering class, Two Rivers finally revealed that the initial

student population was expected to be: 45% white students, 40% African American, 10% Latino,

and 5% Asian.  The only way to achieve a student body that was not close to 84.4% African

American, the level in the school age population, would be to discriminate. Two Rivers used

unlawful processes and is receiving public resources.  Such action was intentional or was the

result of gross negligence. Indeed, the Two Rivers founders were so averse to having their

children interact with low income African American children that they arranged to have a

separate entrance for their children at the Eliot facility.  When the obvious and unlawful

discriminatory admissions process was exposed, the founders and administrators of Two Rivers

then began a recruiting effort to add African American students and improve the admissions

23

numbers,  which established a *prima facie* case of a blatantly discriminatory admissions process. Because the day care classes for three year-olds, the pre-k and kindergarten, as well as the first grade were largely full from the children of the "founders" and their friends, and were accordingly disproportionately white, Two Rivers recruited primarily to add African American students to the upper grades. Even this would not have occurred but for public exposure of the discriminatory admissions process.

45. Defendant Margaret Spellings is being sued in her official capacity as the U.S. Secretary of Education, recently succeeding Rod Paige. She is primarily responsible for administering the provisions of NCLB, and making grants to school districts, including DCPS, conditioned upon compliance with NCLB. Based on the Department of Education's implementation of NCLB, DCPS is required to conduct the testing required by NCLB, and implement its remedial provisions, but does not provide specific funding for these activities. Consequently, DCPS must divert allocated funds for core public school educational functions to comply with DCPS to the detriment of public school students, including Plaintiffs herein. Further, the Department of Education overseas federal grants to DCPS that provide earmarked funding for charter schools and for vouchers even though there is insufficient funding for basic education programs at the DC public schools.

**Class Allegations**

46. All the individual plaintiffs bring this claim as a class action seeking relief from Defendants for all public school children in DC who are similarly situated.

47. The exact number of class members is not known, but it is estimated that most of the approximately 64,000 students in DCPS are daily victims of the unlawful conduct of Defendants

24

with respect to DCPS.  The class is so numerous that joinder of individual members is impracticable.

48. The plaintiffs' injuries arise from a set of facts and circumstances common to that of the class they seek to represent and raise common questions of law.

49. These common questions of law and fact include, but are not limited to whether policies and practices of DCPS result in a denial of due process, equal protection or the denial of a fundamental right to an education under federal law. Further, whether the actions of Defendants result in a violation of the DC human rights law and other aspects of the DC law.

50. The claims of plaintiffs are typical of the claims of each class.

51. Plaintiffs are able to, and will, fairly and adequately protect the interests of each class.

52. Council for plaintiffs are experienced in large civil rights and human rights cases, and in class action litigation, and will fairly and adequately represent the interests of the class.

53. This action is properly maintained as a class action because (a) the prosecution of separate actions by individual members of the class would create a risk of adjudications which would as a practical matter be dispositive of the interests of the other members or would substantially impair or impede their ability to protect their interests, and/or (b) defendants have acted and continue to act on grounds generally applicable to the class, making final injunctive and declaratory relief appropriate.

**First Cause of Action**[2]
**Discriminatory Admissions Process at Two Rivers Charter School and Disparate**
**Treatment Favoring Two Rivers at the Expense of Public Schools**
**in Violation of the Due Process Clause of the Fifth Amendment**
**to the U.S. Constitution, Actionable Under 42 U.S.C. §§ 1981 and 1983,**
**and in Violation of the DC Human Rights Law**

**[By All Plaintiffs Against School Board Defendants,  DC Council Defendants, Defendant**
**Williams, DCPS Defendants, Defendants Baker and Lumpkin, and Defendant Two Rivers]**

54. Plaintiffs incorporate by reference paragraphs 1 through 53 of this Complaint as is set forth herein, and direct this First Cause of Action Against the School Board Defendants, DC Council Defendants, Defendant Williams, DCPS Defendants, Defendants Baker and Lumpkin of the DC Charter School Board, and Defendant Two Rivers.

55. The charter school movement,  in practice and application in DC, has had the effect of further degrading the public schools. It may be a  political objective for some people in Congress to privatize the public schools, even though they could never impose similar legislation on their home districts, but it is a complete abdication of the statutory, legal and moral duty of the DC public and school official Defendants to willfully cooperate in the demise of one of the most important functions of government – to provide quality education in functioning public schools. The illegal impact of this abdication is greatly compounded because the children who need public education the most are those from low income families who often are not aware of options,  and who often lack

---

[2]Pursuant to the Court's July 3rd Order, Plaintiffs' Second, Third, Fourth, and Fifth Causes of Action were dismissed.  These claims asserted respectively: a denial of equal protection and due process for support of charter schools as a whole; a denial of the fundamental right to education; a denial of due process and equal protection based on attending segregated schools; and a denial of substantive due process based on the fundamental failure of governance and mismanagement of DC public schools. However, Plaintiffs continue to believe these are potentially viable causes of action, and accordingly have not waived any rights to pursue such claims in any future appeals process.

the financial resources to opt out of the public school system.

56. Proponents and participants in the charter school movement in DC may take some personal comfort from the rationalization that they are providing "choice" and "options" in a decrepit school system, but the plain reality is that these words apply only to their children. To abandon the children who do not have any choice, and do not have any option, is an anti-community act. To do it with public funds in a way that further reduces funding available to public schools is unlawful.

57. There is no better example of the dysfunctional governance of the DCPS, the willingness of public school officials to favor charter schools at the expense of public schools, and the unlawful inequities in educational opportunities offered charter schools compared with public schools than the situation with Two Rivers charter school.

58. The founders of Two Rivers charter school began with the coded language that they wanted to create a more "diverse" school than the public schools in DC. Given that the public school population in DC is 84.4% African American and 4.6% white, Two Rivers' assertion to the public that they were going to create a school where no single race was in the majority was nothing more than a signal to white parents that the enrollment process would be manipulated to ensure that the school population would not reflect the overall population of the DC applicant pool.

59. Defendant Wells and Defendant Ambrose were both aware of the goal of Two Rivers to create a school where no single race was in the majority, despite the fact that the public school population in DC is 84.4% African American and 4.6% white, and both of them provided assistance and public resources to Two Rivers. Defendant Wells even confirmed publically that he understood that the Two Rivers founders were seeking to create a school where African-Americans were not in the majority. In response to a public question as to why the Two Rivers parents did not try to enroll

in a public school and work with the community to improve it for all of the children who attended it, Defendant Wells stated that the Two Rivers' founders and parents felt that the public schools were "too black."

60. Despite his specific knowledge of the intent of the Two Rivers' founders to create a school that was not "too black," Defendant Wells provided his time, at public expense, and other public resources to assist the Two Rivers school in obtaining a public school building. Initially, he worked with Defendant Ambrose to pressure the owner of the former Buchanan school building to provide Two Rivers with space. Then, when that blackmail scheme failed, he engaged in an unlawful process to provide Van Ness Elementary School to Two Rivers. His plan was to close the existing elementary school, which had a student population that was 100% African-American, bus those children to another school, and provide the newly-empty facility to Two Rivers. Community activists, including some of the Plaintiffs' herein, blocked the illegal closure of Van Ness, which would have clearly been in violation of DCPS regulations regarding a public hearing and comment process before any closure.

61. Following the public controversy regarding the illegal effort to close Van Ness for the benefit of Two Rivers, public demands grew for Two Rivers to release their enrollment figures. Two Rivers finally did release the demographics of the students confirmed for enrollment. The figures are: 45% white students, 40% African American, 10% Latino, and 5% Asian.

62. In a city with a school-age population that is 84.4% African American and 4.6% white, for a school with a legal obligation to recruit city-wide to end up with more white students than African American (45% white students to 40% African American) can only be based on an admissions process that had a discriminatory impact in violation of the principles of *Brown v. Board*

28

*of Education* and *Bolling v. Sharpe*.

63. Among other things, Two Rivers' admissions process had a discriminatory impact on African Americans because the school's mostly white and relatively affluent founders first promoted the school and provided admissions materials to themselves and then to their mostly white and relatively affluent friends. They further recruited from the mostly white organization, Moms on the Hill (MOTH). Their efforts to reach out beyond the mostly white, relatively affluent, families initially admitted to the school in violation of law occurred only after public scrutiny of their discriminatory practices, and even then outreach to African-American families was superficial and was not seriously designed to recruit African Americans, particularly those from low income families. Further, by the time this public relations recruiting was done, the lower grades, including the day care class for three year-olds,  were already full or nearly full with the children of the founders and their friends, leaving only spaces in the upper grades to be filled by the newly-recruited African American students. Indeed, as previously noted, Two Rivers used public funds to create a separate entrance at the Eliot facility to avoid interaction with the existing African American students.

64. Following public disclosure of the Two Rivers' enrollment numbers, each of the Defendant public agencies was provided specific notice of the discriminatory impact of the Two Rivers' admissions process. Public school advocates wrote to each of the concerned public entities and officials and urged that no public funds or resources be provided to Two Rivers, and that such support would be unlawful given the discriminatory impact of the Two Rivers' admissions process. Despite this specific notice, at a July 21, 2004 meeting of the DC School Board, Defendant Rice recommended providing Two Rivers School with space at Eliot Junior High School. In doing so,

Defendant Rice was aware of the discriminatory impact of the Two Rivers' admissions process and yet he persisted in his efforts to provide Two Rivers with public school space. Defendant Wells was a proponent of providing the space at Eliot to Two Rivers despite his specific knowledge of the discriminatory impact of the Two Rivers' admissions process, and his specific knowledge of the Two Rivers' objective of creating a school that was not "too black." Every single member of the DC School Board, except William Lockridge, voted to support the provision of public resources to Two Rivers, and each and every one of these Defendants, Peggy Cooper-Cafritz, Robin Martin, Laura Gardner, Mirian Saez, Carrie Thornhill, Julie Mikuta, and Dwight Singleton, had specific knowledge of the discriminatory impact of the Two Rivers' admissions process. Further, Defendant Williams and the DC Council Defendants further provided public resources to Two Rivers, despite their knowledge of the discriminatory admissions process, when they awarded and funded a one million dollar "City Build" grant to Two Rivers. Defendants' extraordinary desire to provide advantages to Two Rivers is conclusively demonstrated by the fact that Two Rivers is not even located in one of the designated "emerging neighborhoods" required by the terms of the "City Build" program.  For the defendant public officials to provide any public resources to Two Rivers is a denial of due process of law and equal protection guaranteed by the Fifth Amendment to the Constitution.

65. Defendants Baker and Lumpkin were also provided specific notice of the discriminatory impact of the Two Rivers' admissions process. Despite this knowledge, Defendants Baker and Lumpkin refused to revoke the Two Rivers' charter, and refused to hold a hearing to investigate how the school managed to enroll more white students than black students in a school district that is 84.4% African American and 4.6% white. This failure to revoke the charter constitutes unlawful discrimination due to the use of public funds and public sanction to assist a school with a

discriminatory admissions process. This also denies due process of law to the public school students who, through their parents or guardians, were seeking to prevent public funds from supporting a charter school with a discriminatory admissions process.

66. Defendant Two Rivers is itself engaged in joint action or a conspiracy with the Defendant public officials and agencies to obtain public resources to support a school with a discriminatory admissions process. Such participation is a denial of the due process of law and equal protection guaranteed by the Fifth Amendment to the Constitution.

67. The Fifth Amendment Constitutional claims alleged herein are actionable against all defendants based on 42 U.S.C. §§ 1981 and 1983.

68. The discriminatory admissions policy at Two Rivers is also actionable against all designated Defendants under the DC Human Rights Law. Among other provisions, § 2-1402.41 prohibits any educational institution from discriminating based on race, familial status or source of income.

**<u>Second Cause of Action</u> –**
**Violation of Due Process and Equal Protection Clause of the Fifth Amendment to the U.S.**
**Constitution, Actionable Under 42 U.S.C. §§ 1981 and 1983, and Violation of the DC**
**Human Rights Law to Favor Charter Schools With Public Resources**
**at the Expense of Mostly Low Income African American Students in Public Schools.**

**[By All Plaintiffs Against School Board Defendants, DC Council Defendants, Defendant Williams, DCPS Defendants, and Defendant Two Rivers]**

69. Plaintiffs incorporate by reference paragraphs 1 through 68 of this Complaint as is set forth herein, and direct this Second Cause of Action Against the School Board Defendants, DC Council Defendants, Defendant Williams, Defendant Rice, Defendant DCPS, and Defendant Two Rivers.

70. Defendants are either active participants in, or, due to their knowing indifference and complete abdication of their statutory, legal and moral duties to work to provide quality education for public school students in DC,  are willing participants in a process to favor charter schools over public schools, and to ultimately force, or allow, the closure of public schools because they are permitted to fail, and then are ultimately unacceptable to families attending these public schools. This unlawful process is, on a daily basis, sacrificing the students remaining in public schools, who either are trusting that the Defendant public officials are working to improve the public schools, or who are not aware of options to opt out of failing public schools.

71. Among the policies designed to favor charter schools at the expense of public schools are the various funding provisions imposed by Congress, Defendants DC Council, the Mayor, and DC Board of Education that result in higher per pupil expenditures available for charter schools than for public schools.  This problem is greatly exacerbated by the fact that only public schools are forced by law to contribute a portion of their budget to pay for the central administration costs of DCPS. Thus, in a cruel and unlawful irony, public school students are having their programs slashed to pay for the DCPS bureaucracy that is using these public funds to favor charter schools that are exempted from contributing to the DCPS administration.

72. A key example of this is Defendant Two Rivers charter school. Since it has greater per pupil funding than neighborhood public schools, it is able to offer free non-essential day care for three year olds, comprehensive art classes, low student-teacher ratios, full time aides in all classrooms, and language instruction. The students at Eliot, who now share the physical space of their school with Two Rivers, have lost their music, art, language, and technical education programs due to public school budget cuts. Further, neighboring public elementary schools, such as Tyler,

32

Watkins, and Brent,  due to having their budgets cut and having to bear a rising share of the DCPS costs as charter school enrollment grows, have also been forced to cut art, music, and library programs. In addition, they have never had funds for non-essential day care, a luxury that many of the families attending public schools with a single parent and younger children would welcome.

73. In addition to funding, the DC Council Defendants, the Board of Education Defendants, Defendant Rice, Defendant Williams and DCPS favor charter school students over public school students in the provision of public buildings and other public resources. For example, Sousa Middle School requires an extensive asbestos removal this school year. The parents, faculty, staff and students of Sousa have expressed alarm at DCPS plans to conduct the asbestos removal during the school year with classes in session. These concerned citizens made proposals to DCPS and the DC School Board to use either Eliot Junior High School or Evans Middle School as swing space to remove students from harm's way during the asbestos removal. Their requests were refused as both suggested swing space sites had been provided to Charter schools: Defendant Two Rivers was given space at Eliot (at well below market rates), and Maya Angelou Public Charter school was given space at Evans (at the extreme bargain rate of $250 per pupil rent, when the facilities allocation is $1,981).

74. The culmination of this resource favoritism of charter schools over public schools is the new "City Build" initiative of Defendant Williams and the DC Council Defendants. Providing grants with public funds to charter schools, but not to public schools, is a blatant effort to allow public schools to further degrade, while the new facilities of charter schools will lure even more students away from the crumbling public schools. That this policy and practice is discriminatory and unlawful is evidenced by § 38-916 of the DC Code, which requires the Defendants herein to treat "funding

of the *public* schools" as "the highest priority of the District of Columbia." Indeed, the rush to provide large grants to charter schools resulted in a one million dollar grant to Defendant Two Rivers, even though it is not within one of the specified "emerging neighborhoods" that the grant program expressly targets.

75. The disparity in treatment is so great that even functioning public schools are considering converting to charter status to avoid the onerous costs and budget cuts associated with an increasing burden of the public schools to support DCPS while charter schools are free of this requirement. For example, officials and parents at Wilson High School are actively discussing this. There is no recognition in the budget process for schools that succeed, and of how budget cuts to support DCPS will impact the policies that allow schools to succeed.

76. The policy and practice of favoring charter schools over public schools, leaving public schools with inadequate resources, an inferior education, and, in the case of Sousa, a dangerous environment,  is a denial of the due process of law guaranteed by the Fifth Amendment to the Constitution. Further, more than 84.4% of the students in DC public schools are African-American. Many of these students are also from low income families. Low income African American students are a protected class under the Equal Protection clause extended to DC residents by the Fifth Amendment to the Constitution. To provide more resources to charter schools than public schools is therefore a violation of Equal Protection under the Fifth Amendment to the Constitution. The Fifth Amendment Constitutional claims alleged herein are actionable against all defendants based on 42 U.S.C. §§ 1981 and 1983.

77. The denial of equal protection is also actionable against all designated Defendants under the DC Human Rights Law. Among other provisions,  § 2-1402.41 prohibits any educational

34

institution from discriminating based on race, familial status or source of income. Further, § 2-1402.01 provides every person with the equal opportunity to "educational institutions."

**Third Cause of Action –**
**Denial of Fundamental Right to Education and**
**Denial of an Adequate Education, in Violation of the Fifth Amendment to the U.S.**
**Constitution, Actionable Under 42 U.S.C. §§ 1981 and 1983,**
**and in Violation of the DC Human Rights Law**

**[By All Plaintiffs Against School Board Defendants, DC Council Defendants, Defendant**
**Williams, DCPS Defendants, and Defendant Spellings]**

78. Plaintiffs incorporate by reference paragraphs 1 through 77 of this Complaint as is set forth herein, and direct this Third Cause of Action Against the School Board Defendants,  DC Council Defendants, Defendant Williams, DCPS Defendants, and Defendant Spellings.

.    79. From the beginning of our republic, the provision of the fundamental right of education has been identified as a key reason for government to exist. John Adams, for example, was a major proponent of a free public education and viewed it as the foundation for the future of the country. *See* David McCullough, *John Adams*, 364 (2001).

80. In 1948, the United Nations General Assembly adopted the Universal Declaration of Human Rights. The United States voted in favor of this landmark statement of rights. Art. 26-1 of the UN Declaration provides that "[e]veryone has the right to education."  Further, numerous states, either through their constitutions or through recent judicial interpretations of the state constitutions, have expressly recognized either a fundamental right to education or the right to an adequate education.

81. The mismanagement, failure of governance, and lack of accountability of the designated Defendants has resulted in a shocking rate of failure in DC public schools. Under the provisions of

NCLB,  68 of 149 schools in DC failed to meet the objectives of the standardized testing and have been labeled as failing schools. Given this high percentage, and the lack of schools found to be "performing" under the NCLB, many students in DC public schools, including those represented by Plaintiffs herein, will be forced to attend schools that fail to meet the minimum standards of NCLB.

82. The right to an education is fundamental that cannot be denied to any child required by law to attend DC public schools. Students attending DC public schools, including those represented by Plaintiffs herein, are being denied their fundamental right to an education.

83. In addition, due to policies and practices of DCPS, the City Council Defendants and the School Board Defendants, students attending DC public schools, including those represented by Plaintiffs herein, are being denied their fundamental right to an education relative to students attending charter schools or attending private schools with public funds as a result of the school voucher program imposed on DC by Congress. Funding for these voucher and charter programs is provided by, authorized by and/or accepted by the City Council Defendants, the School Board Defendants, and Defendant Williams even though there is not sufficient funding for basic education and facilities in the DC public schools. This is a violation of equal protection that requires public education to be provided on an equal basis to all students required by DC law to attend public schools.

84. The utter failure of DCPS to deliver quality education, with the resulting failure of 68 schools to meet the minimum requirements of NCLB, will result in statutory spending requirements that DCPS provide tutors to students attending a failing school but do not have the opportunity to transfer to a performing school. This new spending requirement will further erode funds needed to run basic education programs within DC public schools, creating a vicious cycle of draining more

resources that will result in more failing schools that require more funds for tutoring. Once again, this burden will fall exclusively upon the dwindling number of children attending DC public schools. Without additional funding for the remedial requirements of NCLB, enforcement of this aspect of the law by Defendant Spellings will perpetuate, if not exacerbate, the abhorrent conditions in DC public schools.

85. The foregoing acts and omissions of Defendants result in a denial of due process and equal protection under the Fifth Amendment to the Constitution because there is an ongoing denial of a fundamental right to an education and causes students in DC public schools to lose further education resources relative to students in charter schools or private schools using public funds for vouchers. The Fifth Amendment Constitutional claims alleged herein are actionable against all designated Defendants based on 42 U.S.C. §§ 1981 and 1983.

86. The denial of the fundamental right to an education is also actionable against all designated Defendants under the DC Human Rights Law. Among other provisions, § 2-1402.01 provides every person with the equal opportunity to "educational institutions." The policies and practices of Defendants, including the use of public funds for charter schools at the expense of public schools, the resulting inadequacy of funding, and the consequent failure to provide an adequate education to public school students, is a clear inequality visited upon low income African American public school students attributable to acts and omissions of Defendants.

87. In the event that there is not a fundamental right to education recognized as applicable to DC public school students, this would itself be a denial of equal protection under the Fifth Amendment to the Constitution, actionable against all Defendants based on 42 U.S.C. §§ 1981 and 1983. It would also violate the equal protection guarantee of § 2-1402.01 of the DC Human Rights

Law. Numerous states, including New York, North Carolina, Kansas, and California, have recognized that, under their state Constitutions, failure to fund and provide for an adequate education denies the fundamental right to an education. To penalize DC public school students and deprive them of this right enjoyed by citizens of states facing comparable education problems would deny DC residents equal protection of the laws.

88. Based on § 2-1402.01 of the DC Human Rights Law, Plaintiffs, like students in North Carolina, New York, Kansas, and California, have a right to education funding that is adequate to provide a basic, functional education. The per pupil formula utilized to provide funding for public schools does not provide sufficient funds for an adequate education, particularly given that the public schools are required to forfeit approximately 11% of this allotment to pay for central administration and "services" of DCPS while charter schools are not. Plaintiffs herein request that § 2-1402.01 of the DC Human Rights Law be applied to ensure them the necessary funding for an adequate education, overall, and relative to charter school students and private school students receiving public support through vouchers.

## Fourth Cause of Action –
**Students Attending Segregated Schools Resulting From DCPS Policies and Practices Are Denied Due Process and Equal Protection in Violation of the Fifth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. §§ 1981 and 1983, and in Violation of the DC Human Rights Law.**

**[By All Plaintiffs Against School Board Defendants, DC Council Defendants, Defendant Williams, and DCPS Defendants]**

89. Plaintiffs incorporate by reference paragraphs 1 through 88 of this Complaint as is set forth herein, and direct this Fourth Cause of Action Against the School Board Defendants, DC Council Defendants, Defendant Williams, and DCPS Defendants.

90. The pervasive mismanagement, lack of accountability and poor governance of DCPS has driven most middle and upper income families, both white and African American, out of the public schools. The result is the students at most DC public schools, including those represented by Plaintiffs herein, are mostly low income African Americans. The school population within DCPS is 84.4% African American, and approximately 75% of all DCPS students are eligible for federal lunch subsidies.   This problem has been greatly exacerbated by the push by the designated Defendants to favor charter schools, and to provide public funds for vouchers to attend private schools. Defendants not only accept that DC has a segregated school system, but are affirmatively acting to keep it this way by encouraging middle and upper income white and African-American parents to opt out of the system, leaving mostly low income African American students.

91. Plaintiffs herein, and the students they represent, are forced to attend substandard public schools that in DC are in many cases 100% African American. If the ruling in *Brown v. Board of Education* means anything, then there is a daily violation of the equality principle occurring in most DC public schools because the students attending them do not have the benefit of a diverse environment. Moreover, the near abandonment of DC public schools by middle and upper income families, both white and African American, has left the remaining students in an environment where they do not have the opportunity to interact with students from different economic backgrounds, an entirely different form of segregation. Indeed, the new "City Build" initiative of Defendant Williams is conclusive evidence of Defendants' policy to abandon existing public schools, and the students within them, to focus on building a duel system of charter schools and private schools supported by public funds.

92. The failure of Defendants to provide quality education and to implement programs to

39

attract and retain middle and upper income families, both white and African American, results in a denial of due process and equal protection under the Fifth Amendment to the Constitution. The Fifth Amendment Constitutional claims alleged herein are actionable against all designated Defendants based on 42 U.S.C. §§ 1981 and 1983.

93. The denial of equal rights resulting from the segregated schools in DC is also actionable against all designated Defendants under the DC Human Rights Law. Among other provisions, § 2-1402.01 provides every person with the equal opportunity to "educational institutions."

**Fifth Cause of Action-**
**Fundamental Failure of Governance and Resulting Mismanagement of DCPS is a Denial of Due Process Clause of the Fifth Amendment to the U.S. Constitution, Actionable Under 42 U.S.C. §§ 1981 and 1983, and Violates the DC Human Rights Law**

**[By All Plaintiffs Against School Board Defendants, DC Council Defendants, Defendant Williams, and DCPS Defendants]**

94. Plaintiffs incorporate by reference paragraphs 1 through 93 of this Complaint as is set forth herein, and direct this Fifth Cause of Action Against the School Board Defendants,  DC Council Defendants, Defendant Williams, and DCPS Defendants.

95. The extreme structural problems of DCPS result in a complete lack of accountability and a failure to offer to the public a process wherein serious complaints and even violations of law can be addressed effectively and efficiently.

96. For example, when public school activists initially tried to raise concerns about the discriminatory admissions process at Defendant Two Rivers, the DC Board of Education proclaimed its innocence in the process by pointing out that Two Rivers' charter was granted by the DC Charter

School Board, not the DC Board of Education. Members of the DC Charter School Board, including Defendants Baker and Lumpkin, responded that they only grant charters, but that it was the DC Board of Education that voted to provide Two Rivers with a public building and other resources. The DC Council and Defendant Ambrose claimed not to have any authority over school-related decisions, but the DC Board of Education and Defendant Wells claimed that the DC Council required them to assist charter schools once they are provided a charter. Defendant Rice and DCPS likewise claim to have a legal obligation to assist charter schools, but lack the ability to make decisions about priorities and whether it is appropriate to favor charter schools over public schools. Defendant Williams claims also to have no legal power to effect decisions about particular schools, but his failure to provide leadership and to force the budgeting process to match funds with priorities, leaves the DCPS floundering without clear authority or direction.

97. Another example of the overall ineptness of the DCPS, and the resulting harm to public school students is the situation at Sousa Middle School. Only a school district that has utterly broken down in its ability to make policy and implement rational decisions could, as previously described, refuse to provide swing space to students exposed to asbestos because the available, alternative space had been promised to charter schools.  Indeed, when parents and teachers tried to raise the Sousa asbestos issue at the July 21, 2004 meeting of the DC School Board, it was stricken from the agenda due to alleged time constraints, but there was time at the meeting to consider and grant the Two Rivers request for space at Eliot Junior High School.

98. There are numerous other examples of the gross mismanagement that has resulted in injury to public school students. Further, binding laws and regulations regarding the issuance of charters, the public hearing process for closing public buildings, and the laws regarding competitive

bidding to purchase or lease public school buildings are routinely ignored, waived and/or violated by the Defendant public officials. These problems are further compounded when Defendants Rice, Wells, DCPS and DC Board of Education spend significant amounts of time resolving problems and providing services for the more vocal and organized groups of parents enrolled in charter schools, which do not even contribute to the costs of DCPS administration and management. The failure to have an accountable process for participants in public schools to raise serious issues has resulted in a complete paralysis of the system. Parents and teachers are now resigned to the fact that the DCPS bureaucracy is so unresponsive and indifferent that they no longer bother trying to raise issues due to futility. The failure of Defendants to provide an adequate process to allow serious issues of law and policy to be addressed by concerned parents and teachers is a denial of due process under the Fifth Amendment to the Constitution. The Fifth Amendment Constitutional claims alleged herein are actionable against all Defendants based on 42 U.S.C. §§ 1981 and 1983.

99. The denial of due process is also actionable against all defendants under the DC Human Rights Law. Among other provisions,  § 2-1402.41 prohibits the denial of protected rights.

## DEMAND FOR JURY TRIAL

100. Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request the Court to:

### With Respect to Plaintiffs' First Cause of Action:

A. Issue a Declaratory Judgment that the due process and equal protection requirements of the Fifth Amendment to the Constitution and the DC Human Rights Law have been violated

by the discriminatory admissions process of Defendant Two Rivers charter school;

B. Issue a Preliminary Injunction restraining the Board of Education Defendants, the DC Council Defendants, DCPS Defendants, and Defendant Williams from providing any public funds, resources, services or other benefits to Two Rivers charter school and from working in any public capacity to assist Two Rivers;

C. Issue a Declaratory Judgment that the due process and equal protection requirements of the Fifth Amendment to the Constitution and the DC Human Rights Law were violated when Defendants Baker and Lumpkin issued a charter to Two Rivers and when they refused to hold a public hearing and/or revoke that charter upon learning of the specific discriminatory admissions process at Two Rivers, and Order Defendants Baker and Lumpkin, as the Executive and Deputy Directors of the DC Charter School Board, to revoke the charter of Two Rivers, Order that the Defendants Baker and Lumpkin refrain from issuing any new charters for any schools until its policies are changed to require a specific inquiry regarding compliance with due process and equal protection requirements of the Fifth Amendment of the Constitution and the equal treatment requirements of the DC Human Rights Law;

**With Respect to Plaintiffs' Second Cause of Action**:

D. In addition to the relief requested with respect to Plaintiffs' First Cause of Action, Issue a Declaratory Judgment that the laws, policies and practices that allow DCPS to favor charter schools over public schools with respect to funding and resources are in violation of the due process and equal protection requirements of the Fifth Amendment to the Constitution, the equality requirement of the DC Human Rights Law, and prohibiting any further grants of charters until the equality of funding issues are resolved, and issue a Preliminary Injunction requiring that

DCPS Defendants, the DC Council Defendants, and the Board of Education Defendants act immediately to find swing space for the community at Sousa to avoid the hazards of exposure to asbestos;

E. Appoint a Special Master to assess the conflicting laws, regulations, and policies that result in unequal funding and resource allocation that favor charter schools over public schools, and make recommendations to the Court for a specific order that could be issued to accomplish at least equal treatment and equal funding for public school students relative to charter school students in DC, and to implement in a practical way the requirement of § 38-916 of the DC Code that "funding of the *public* schools be acknowledged as of the highest priority of the District of Columbia;"

**With Respect to Plaintiffs' Third Cause of Action**:

F. In addition to the relief requested with respect to Plaintiffs' First and Second Causes of Action, Issue a Declaratory Judgment that the laws, policies and practices governing DCPS result in the denial of the fundamental right to education to students attending DC public schools in violation of the due process and equal protection requirements of the Fifth Amendment to the U.S. Constitution, as well as the equality requirements of the DC Human Rights Law;

G. Order the Special Master to assess the conflicting laws, regulations, and policies that result in the denial of the fundamental right to education, the denial of equal protection, and the denial of an adequately funded education for DC public school students, and make recommendations to the Court for a specific order that could be issued to obtain compliance with a reasonable standard of education in the public schools;

H. Issue a Declaratory Judgment that NCLB is unconstitutional insofar as it requires specific funding obligations that detract from providing for an adequate education without also earmarking specific funds for those purposes, and also issue a Declaratory Judgment that the various appropriations from Congress that favor charter schools and provide earmarked funds for charter schools and vouchers in DC violate the Fifth Amendment to the Constitution and the DC Human Rights Law insofar as these appropriations penalize public school students and detract from funding that could be available to public schools to allow DCPS to provide an adequate education for public school students;

**With Respect to Plaintiffs' Fourth Cause of Action**:

I. In addition to the relief requested with respect to Plaintiffs' First, Second, and Third Causes of Action, issue a Declaratory Judgment that the laws, policies and practices governing DCPS that create a *defacto* segregated school system are unlawful and deny due process and equal protection under the Fifth Amendment to the Constitution, and also violate the equality provisions of the DC Human Rights Law;

J. Order the Special Master to assess the laws, policies and practices governing DCPS that create a *defacto* segregated school system and make recommendations to the Court for a specific order that could be issued to begin the process of creating a diverse, integrated public school system in DC, including a plan to take affirmative steps to promote a back-to-the-city movement to encourage suburban residents who fled DCPS to return to DC;

**With Respect to Plaintiffs' Fifth Cause of Action**:

K. In addition to the relief requested with respect to Plaintiffs' First, Second, Third, and Fourth Causes of Action, issue a Declaratory Judgment that the laws, policies and practices

45

governing DCPS that fail to provide an adequate process to allow issues of law and policy to be

addressed by concerned parents and teachers result in a denial of due process under the Fifth

Amendment to the Constitution, and fail to provide rights and remedies to DC public school

students in violation of the DC Human Rights Law;

      L. Order the Special Master to assess the laws, policies and practices governing DCPS

that result in a denial of due process to address concerns of violations of law and policy, and

make recommendations to the Court for a specific order to develop a process that would meet the

requirements of due process under the Fifth Amendment to the Constitution and the applicable

provisions of the DC Human Rights Law;

      **With Respect to All Causes of Action**:

      M. Implement with an appropriate Order following review by the parties, and an

opportunity for comment, the recommendations of the Special Master with a special focus on

ensuring that public school success is required to be the priority for the Defendants, and that

public schools are not placed at a funding, resource or facilities disadvantage in any way

compared with charter schools;

      N. Order that all public official Defendants participate in an appropriate program

regarding the requirements of the Constitution, the Laws of the United States and the District of

Columbia with respect to nondiscrimination, due process, equal protection, and the fundamental

right to an education;

      O. With respect to violations of 42 U.S.C. §§ 1981 and 1983, and the DC Human Rights

Law, award Plaintiffs compensatory and punitive damages;

      P. Grant Plaintiffs equitable relief, permanently enjoining Defendants from further

violations of law, regulation or practice;

     Q.  Award Plaintiffs the costs of suit including reasonable attorneys' fees under any

applicable fee-shifting statute, provision or other law;

     R.  Award Plaintiffs such other and further relief as the Court deems just under the

circumstances.

     Respectfully submitted this 20th day of November, 2006 by:

_____

Terry Collingsworth
DC Bar # 471830
Natacha Thys
DC Bar # 458143
Law Office of Terry Collingsworth
2001 S Street, NW, Suite 420
Washington, DC 20009
Tel:202-255-2198
Fax 202-347-4885